STATE OF NORTH CAROLINA v. BONNIE SUE CLARK

No. 27A88

(Filed 2 March 1989)

**1. Criminal Law § 75.7— statements not result of custodial interrogation**

Oral and written exculpatory statements made by defendant at the police station were not the products of custodial interrogation, and *Miranda* warnings were not required for their admission, where defendant was found slumped over the steering wheel of a car and the body of her husband, who had been stabbed to death, was lying between the front and back seats of the car; defendant stated that both car doors had been opened and she had been rendered unconscious; defendant was taken by rescue squad vehicle to a hospital in the company of a police officer; the officer remained with defendant throughout the half-hour of tests and treatment; defendant agreed to accompany another officer to the police station so he could obtain a statement as to what happened; defendant reiterated her exculpatory statement and began writing it a half hour after her arrival at police headquarters; all officers who were at some time with defendant from the moment she was found to the time she reiterated the statement at police headquarters viewed defendant as a victim; and the investigation of the murder of defendant's husband did not actually focus upon defendant until after she signed her written exculpatory statement. Defendant's constant accompaniment by police personnel and the fact that the officer who took her from the hospital to police headquarters admitted to being "suspicious" of defendant was not tantamount to custodial interrogation.

**2. Criminal Law § 75.4— continuation of interrogation—request for counsel not shown**

Defendant's inculpatory statement was not inadmissible on the ground that interrogation continued despite her request to have an attorney present where the evidence supported the trial court's findings that, although defendant expressed reservations about whether to talk with officers without first contacting a lawyer, she was repeatedly told that she could use the telephone and that she could call a lawyer immediately, but she never invoked her right to counsel and eventually signed a waiver of rights form.

State v. Clark

### 3. Criminal Law § 75.7— encouragement to tell truth not interrogation

Encouraging a defendant to tell the truth, even after he or she has asked for a lawyer, does not constitute interrogation or its functional equivalent and does not render a subsequent confession involuntary.

### 4. Criminal Law § 81— life insurance policy—knowledge by defendant—best evidence rule inapplicable

Testimony that a witness saw at defendant's residence a life insurance policy which insured deceased and named defendant as beneficiary did not violate the best evidence rule where the testimony was offered not to prove the contents or terms of the policy but to show defendant's knowledge that the policy existed. Assuming error arguendo, the fact that the actual contents of the policy were before the jury through the testimony of insurance personnel nullified any prejudicial effect the testimony might have had upon the outcome of defendant's trial. N.C.G.S. § 15A-1443(a) (1988).

### 5. Criminal Law § 74.2— prosecutor's question—Bruton rule not violated

The prosecutor's question to defendant as to whether a non-testifying co-defendant "tried to put the blame on you, and you are trying to put the blame on him, is that right?" did not violate the rule in *Bruton v. United States*, 391 U.S. 123 (1968). Any arguable error was cured by the admission of defendant's statements clearly setting forth her role and motives and those of the codefendant in the murder in question.

### 6. Criminal Law § 50.1; Homicide § 15.2— intent to kill—ultimate jury issue—expert testimony not precluded

A clinical psychologist was not precluded from stating an opinion as to whether defendant was able to form the specific intent to kill the victim merely because such testimony embraced an ultimate issue to be decided by the jury. N.C.G.S. § 8C-1, Rule 704 (1988).

### 7. Criminal Law § 50.1; Homicide § 15.2— intent to kill—expert testimony properly excluded

The trial court properly excluded expert testimony by a clinical psychologist as to whether defendant had the ability to form the specific intent to kill 'the victim where the witness admitted that his conclusions regarding defendant's mental condition on the day of the murder were "purely speculative" and "conjecture," and the witness indicated no comprehension of the legal significance of "specific intent." N.C.G.S. § 8C-1, Rule 702 (1988).

### 8. Homicide § 25.2— specific intent to kill—consideration of mental condition of defendant—when instruction required

When a defendant requests the trial court to instruct the jury that it may consider the mental condition of defendant in deciding whether he or she formed a premeditated and deliberate specific intent to kill the victim, the proper test of the legal sufficiency of the evidence for such an instruction is whether the evidence of defendant's mental condition is sufficient to cause a reasonable doubt in the mind of a rational trier of fact as to whether the defendant was capable of forming the specific intent to kill the victim at the time of the killing.

**9. Homicide § 25.2— specific intent to kill—mental condition of defendant—instruction not required**

The trial court in a first degree murder case did not err in refusing to instruct the jury that it could consider evidence of defendant's mental disorder as rendering her incapable of forming the specific intent to kill where a clinical psychologist testified to an endemic mental condition, but he never suggested that defendant's disorder might have rendered her incapable of forming a premeditated and deliberate specific intent to kill; the evidence presented by defendant tended to show that her personality disorder had affected her since childhood and that, although the disorder appeared to have been exacerbated by the experience of living with abusive, domineering males, she had actually twice extricated herself from such situations by moving out; and the evidence showed that defendant not only physically accompanied a codefendant when he stabbed her husband, but she arranged the rendezvous with her husband and drove the car.

**10. Homicide § 30— first degree murder—intent to kill—instruction on second degree murder not required**

In a prosecution of defendant for the first degree murder of her husband as an aider and abettor, defendant's evidence that she tried numerous times to talk her codefendant out of his intention to kill her husband, and that she behaved more or less robotically, allowing the codefendant to make the decisions and "just doing what he told" her, did not present a jury question on intent to kill so as to require the trial court to instruct on second degree murder where evidence presented by the State and by defendant, including testimony that defendant knew for some time of her codefendant's intent to kill her husband, that she arranged for the codefendant to be in the same place at the same time as her husband, and that she was also present at the time of the killing, belied anything other than a premeditated and deliberate killing.

**11. Criminal Law § 123; Homicide § 31— verdict form—theory of aiding and abetting**

The trial court's addition of the basis for first degree murder in its listing on the verdict form of the possible verdict of "guilty of murder in the first degree by aiding and abetting" did not constitute an expression of opinion in violation of N.C.G.S. § 15A-1232, could not have confused the jury, and was supported by N.C.G.S. § 15A-1237.

**12. Constitutional Law § 32— restriction of public egress during jury arguments—no denial of public trial**

The trial judge's warning to spectators of a first degree murder trial that they would not be allowed to leave the courtroom after closing arguments began did not constitute the denial of a public trial and was authorized by N.C.G.S. § 15A-1034(a) (1988). Sixth Amendment to the U.S. Constitution; Art. I, §§ 18 and 24 of the N.C. Constitution.

**13. Criminal Law § 85.3— cross-examination of defendant—specific instance of reprehensible conduct—inadmissibility—harmless error**

The prosecutor's cross-examination of defendant about whether she enjoyed smoking marijuana was improper under N.C.G.S. § 8C-1, Rule 608(b),

since defendant's admission to having smoked marijuana had no tendency to prove or disprove her credibility; furthermore, the question and its elicited response were also barred by N.C.G.S. § 8C-1, Rule 404(b), which prohibits evidence of other crimes, wrongs, or acts to prove defendant acted in conformity with a character trait those acts exhibit. However, the admission of such evidence was not prejudicial error in light of the overwhelming evidence of defendant's guilt and other circumstances of this case.

**14. Criminal Law § 138.42— honorable discharge mitigating circumstance—erroneous failure to find**

In sentencing defendant for conspiracy to commit murder, the trial court erred in failing to find the statutory mitigating circumstance that defendant had been honorably discharged from the armed services where defendant gave uncontradicted testimony that she had been honorably discharged from the Marine Corps on two separate occasions. N.C.G.S. § 15A-1340.4(a)(2)(o) (1988).

Justice WEBB dissenting.

APPEAL by defendant from judgments sentencing her to consecutive terms of life imprisonment for conviction of murder in the first degree and ten years for conviction of conspiracy to commit murder, said judgments imposed by *Stevens (Henry L.), J.,* at the 10 August 1987 session of Superior Court, DUPLIN County. Heard in the Supreme Court 11 October 1988.

*Lacy H. Thornburg, Attorney General, by David Roy Blackwell, Special Deputy Attorney General, for the state.*

*Charles H. Henry, Jr. and Walter W. Vatcher for defendant.*

MARTIN, Justice.

Defendant was convicted in a capital trial of murder in the first degree and of conspiracy to commit murder in the stabbing death of her estranged husband, Glennie Clark. She was sentenced to life imprisonment for the murder and to ten years' imprisonment for the conspiracy, the latter to commence at the termination of the life sentence. We find no error on the charge of murder in the first degree. However, with regard to the conviction of conspiracy we conclude that the sentencing court's erroneous failure to consider a statutory mitigating factor entitles defendant to a new sentencing hearing.

Evidence presented by the state tended to show that at 11 p.m. on 1 February 1987, defendant was discovered slumped over the steering wheel of a car parked in a movie theatre parking lot.

The police officer who first approached the car saw the body of a white male lying between the front and back seats, his head resting on the back seat. Detecting no vital signs on the male, the officer directed his flashlight beam onto defendant's face. Before he could reach in to check her, she aroused, shaking vigorously and screaming.

When the officer asked defendant what had happened, she replied that both doors had flown open and someone had slammed her head against the steering wheel, rendering her unconscious. Defendant was unable to provide further information as to the assailant, and after she was examined at the hospital, she reiterated this exculpatory explanation at the police station and reduced it to writing. Both the oral and written exculpatory statements were introduced at trial through the testimony of the interviewing officers.

About the same time defendant was being taken from the hospital to police headquarters, another officer interviewed a moviegoer who said he had observed a man later identified as Robert Bacon, Jr., enter defendant's car and depart with her around 8:30 p.m. The officer proceeded to defendant's house, where he was admitted by Robert Bacon, Jr. Bacon permitted the officer to view the bedroom that he shared with defendant. There the officer discovered and seized bloody clothes and shoes, which he brought back to headquarters around 3 p.m. Defendant was then read her rights. An hour later defendant signed a rights waiver form and offered a lengthy inculpatory statement.

In this statement defendant recounted the vicissitudes of marriage to an alcoholic, the couple's eventual separation, and the development of defendant's romantic relationship with Bacon. Defendant went on to describe the origin and evolution of the idea of killing her husband and how the plan was eventually executed.

Much of this statement was reiterated and detailed when defendant took the stand at her trial. She testified that her father had been a heavy drinker and that consequently family life throughout her childhood had been wrought with tension. Immediately after graduating from high school she joined the Marine Corps, where she met and married her first husband. A year and a half after their marriage, her husband left the Marine Corps and lived on unemployment benefits and defendant's earn-

ings, spending his days partying with friends and dissipating most of the couple's money on drugs. He was domineering, violent, and abusive, and defendant reenlisted in 1980 in order to escape the marriage.

Defendant was assigned to Parris Island, where she met Glennie Clark. She became pregnant with his child and married him 5 March 1982, one day after receiving her divorce from her first husband. Towards the end of her pregnancy, Clark's occasional drinking increased to between six and twelve cans of beer a night and a case a day on weekends, and he began to abuse defendant physically. In April or May, Clark was ordered on a twelve-month tour in Japan, and in his letters home to defendant he repeatedly promised that he would drink no more upon his return. The promises proved to be in vain, however, and upon his arrival home he returned to his pattern of excessive drinking and abuse of defendant. That summer, defendant, again pregnant, moved with her son to the house of a girlfriend. But she moved back in with Clark when his promises of reform were accompanied by his enrollment in alcohol rehabilitation and anti-abuse programs. The reform was short-lived. A month after the birth of their second child, the excessive drinking and physical abuse began again. This pattern was repeated with a second, shorter overseas tour and Clark's return to North Carolina and daily inebriation in the summer of 1986.

Defendant, exasperated by her husband's inability to face the fact of his drinking and disgusted with what he had become, made plans to leave Clark, intending to share the expenses of a house with two other women. When one woman backed out, defendant invited Bacon, a friend from work, to fill in.

Defendant left Clark in October, but despite the separation, her husband continued to harass her by telephone, by turns professing his love and pleading with her to return, and berating her and blaming her for creditors' calls. Although he contributed financially to the support of their two children, he did so only sporadically, and defendant was compelled constantly to juggle family bills.

Defendant testified that "the worse things got" between her and her husband, the closer she drew emotionally and romantically to Bacon. Defendant added that she became "real dependent"

on Bacon, and in her anxiety that he not leave her, she was careful not to do or say anything that would make him mad and "would just do whatever he said." Shortly before Christmas, defendant, distressed and unnerved by her husband's incessant intrusion, said to Bacon that she wanted her husband dead. Although she had uttered such remarks before "jokingly," this time Bacon responded after a pause that "it could be arranged." Bacon told defendant he did not wish her to be involved, and he avoided responding to her questions and doubts, saying it was none of her business.

Defendant explained that because her husband rarely left his house, Bacon was unable to seize the opportunity to kill him. In response to Bacon's suggestion that defendant try to get her husband out of the house, she invited Clark out to see a movie, where, drunk, he created a disturbance and eventually left the theatre to await her in the car. Defendant expected to return to find him dead, but Bacon later told her that the nearby presence of policemen had foiled his plan. Bacon then outlined a plot for the following day, from which defendant attempted to dissuade him. Although she testified that she knew the revised plan would not work, defendant said she "didn't care": "No matter what the consequences of that would have been, anything was better than living the way I was living. He was making the decisions and I was just doing what he told me."

Defendant's testimony concluded by detailing the success of the plan the following day. When her husband called the next morning to apologize for his behavior the night before, she arranged another movie date with him for that evening. Defendant drove to the theatre parking lot where she met Bacon, and he accompanied her to the rendezvous with her husband. She told her husband she was giving Bacon a ride home, and in accord with this ruse, she followed Bacon's directions through dark, suburban streets. Bacon, who was in the back seat, reached over the front seat, grabbed the victim, and began stabbing him. Defendant continued driving, returning eventually to the theatre where Bacon exited, deposited his bloody shoes in the car he had left there, and unsuccessfully attempted to render defendant unconscious by ramming her head against the steering wheel. Bacon then thrust her head several times against the door glass, and defendant passed out. Regarding her earlier false statements, defendant

testified that Bacon had told her to say upon discovery that she and her husband had been robbed, that the doors had flown open, and that she had been knocked out and remembered no more.

[1]  On appeal, defendant's assignments of error include her contention that the oral and written exculpatory statements made at the police station should not have been admitted because they were the products of custodial interrogation prior to her having been advised as to her constitutional rights as required by *Miranda v. Arizona*, 384 U.S. 436, 16 L.Ed. 2d 694, *reh'g denied*, 385 U.S. 890, 17 L.Ed. 2d 121 (1966). Defendant contends that her constant accompaniment by police personnel and the fact that the officer who took her from the hospital to police headquarters admitted to being "suspicious" was tantamount to a custodial interrogation.

The trial court held a voir dire hearing on defendant's motion to suppress certain evidence, including these statements. That court found that defendant was taken by rescue squad vehicle to a hospital in the company of a police officer, in accord with the standard police procedure for transporting a victim for medical treatment, and that the officer remained with defendant throughout the half hour of tests and treatment. The trial court noted that defendant was then asked by another officer if she would accompany him to the police station so he could "obtain a more full statement . . . with respect to what had happened and to attempt to identify the perpetrators of this offense." Defendant agreed to do so. The trial court also found that defendant began writing her exculpatory statement around 2 a.m., a half hour after her arrival at police headquarters. She was asked no further questions until the statement was completed, around 3 a.m. At about that time, an officer arrived with the bloody clothes seized from defendant and Bacon's bedroom. Shortly after being confronted with this evidence, defendant was advised of her Miranda rights. The trial court concluded that both oral and written exculpatory statements had been voluntarily made and that "no reasonable person in the defendant's situation at that time would have believed herself to be under arrest or in any way deprived of her liberty."

If after having conducted a voir dire hearing to determine the admissibility of challenged statements, the trial court's find-

ings of fact are supported by competent evidence, these are conclusive and binding on the appellate court. *State v. Thompson,* 287 N.C. 303, 214 S.E. 2d 742 (1975), *death sentence vacated,* 428 U.S. 908, 49 L.Ed. 2d 1213 (1976). The record amply supports the trial court's findings of fact regarding the circumstances surrounding defendant's exculpatory statements. All three officers who were at some time with defendant from the moment she was found to the moment she reiterated the statement at police headquarters testified that they viewed defendant as a victim. The officer who interviewed defendant later at the police station testified that up until the time defendant signed her written exculpatory statement, she could have left had she wanted to. Although the same officer admitted to having been "suspicious" of defendant, he testified that this was his nature. His suspicions intensified as details about an investigation simultaneously being carried out at defendant's house were radioed back to headquarters, but the investigation of the murder of defendant's husband did not actually focus upon defendant until the arrival of the bloody clothes.

"A custodial interrogation is 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.' " *State v. West,* 317 N.C. 219, 227, 345 S.E. 2d 186, 191 (1986) (quoting *Miranda v. Arizona,* 384 U.S. at 444, 16 L.Ed. 2d at 706). The record solidly supports the trial court's conclusion that defendant was not in custody at any time prior to completely recording her exculpatory statements and that these were voluntarily made. This being true, Miranda warnings were not required. *State v. West,* 317 N.C. 219, 345 S.E. 2d 186. We consequently affirm the trial court's denial of defendant's motion to suppress those statements.

[2] Defendant also contends that her inculpatory statement made an hour later was improperly admitted because interrogation continued despite her request to have an attorney present. It is well established that once an accused expresses her desire "to deal with the police only through counsel, [she] is not subject to further interrogation by the authorities until counsel has been made available to [her]." *Edwards v. Arizona,* 451 U.S. 477, 484-85, 68 L.Ed. 2d 378, 386, *reh'g denied,* 452 U.S. 973, 69 L.Ed. 2d 984 (1981). The trial court's findings of fact following the voir dire

hearing on defendant's motion to suppress indicate, however, that "defendant never invoked her right to counsel. . . . [She] did express some reservations about whether or not she should talk with the officers without first contacting an attorney in that she stated that she did not know what to do." Based on these findings, the trial court concluded that defendant's inculpatory statement was "freely, understandingly, voluntarily, and knowingly given without any promises, threats, rewards, hope of reward, coercion or pressure of any kind," and that it was given after a similarly comprehensively knowing waiver of her constitutional rights.

[3] The trial court's findings are, again, supported by competent evidence in the record. The voir dire testimony of the two officers who read defendant her Miranda rights indicated that although they were convinced that defendant understood her rights as read to her, she was uncertain and ambivalent as to what to do. She indicated that she wanted to talk to them, yet she hesitated to sign the waiver form. She was told repeatedly that she could use the telephone, which was less than six feet away, and, specifically, that she could call a lawyer immediately if she cared to. Eventually, at 3:52, the officers placed a third waiver form before defendant, which she signed, subsequently offering a lengthy inculpatory statement. Although the officers had spoken between themselves within defendant's earshot about the evidence that had accrued against her, and although one of them urged her to tell her side of the story, at no time did the officers initiate questioning or so badger defendant that their "words or actions [would have been] reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 64 L.Ed. 2d 297 (1980). Encouraging a defendant to tell the truth, even after she has asked for a lawyer, does not constitute interrogation nor its "functional equivalent," *State v. Allen*, 323 N.C. 208, 372 S.E. 2d 855 (1988), nor does it render a subsequent confession involuntary, *State v. Dishman*, 249 N.C. 759, 107 S.E. 2d 750 (1959). The opportunity to call an attorney was freely available to defendant. Her indecision and inability to exercise that opportunity cannot by any imaginative leap be construed as an abrogation by the officers of her right to have an attorney present during a custodial interrogation. We hold that the trial court did not err in concluding that defendant's inculpatory statement was admissible.

**[4]** Defendant next contends that the trial court erred in admitting the testimony of Karen Rosser regarding papers she had found in the house where she lived with defendant and Bacon. Rosser testified that in collecting defendant's personal belongings at the request of defendant's parents, she came upon a folder containing "papers that related to a life insurance policy on Glennie Clark" and in which she saw defendant's name listed first as beneficiary. Defendant notes that admission of this testimony violated the best evidence rule, which requires that the original writing be offered in order to prove its contents. N.C.G.S. § 8C-1, Rule 1002 (1988).

The best evidence rule applies only when the contents of a writing are in question. 2 Brandis on North Carolina Evidence § 191 (3d ed. 1988). The contents of the policy insuring the life of defendant's husband were not in question. Rosser's testimony as to the policy was collateral. *See* N.C.G.S. § 8C-1, Rule 1004(4) (1988). It was offered not to prove contents or terms, but simply to show defendant's knowledge that the policy existed. Further, the actual contents of that insurance policy as well as a military policy insuring the life of defendant's husband were introduced through the testimony of military and civilian insurance personnel, who had consulted their business records and testified that defendant was the primary beneficiary on both policies. Because her testimony was not offered to prove the policy contents, Karen Rosser's testimony regarding those papers was therefore properly determined admissible by the trial court. Even assuming error arguendo, the fact that the actual contents of those policies were before the jury through the testimony of insurance personnel nullified any prejudicial effect Ms. Rosser's testimony might have had upon the outcome of defendant's trial. N.C.G.S. § 15A-1443(a) (1988).

**[5]** Defendant next contends the trial court erred in permitting the following question by the district attorney:

[MR. ANDREWS] So Robert tried to put the blame on you, and you are trying to put the blame on him, is that right?

MR. VATCHER: Objection.

MR. ANDREWS: I will withdraw the question, Your Honor.

COURT: Cross examination; objection overruled.

Defendant perceives this question as contravening the rule in *Bruton v. United States*, 391 U.S. 123, 20 L.Ed. 2d 476 (1968), that the government may not introduce into evidence a statement of a codefendant imputing guilt to the defendant where the codefendant does not testify and is not subject to cross-examination. We find *Bruton* principles inapplicable to this mere allusion to a self-exonerating remark of a codefendant. Any arguable error by the trial court in allowing this question was cured by defendant's oral and written statements, both exculpatory and inculpatory, which were before the jury through her testimony and which set forth clearly her role and motives and those of Bacon in her husband's murder. For this reason alone the district attorney's question could have had no possible influence on the jury with regard to the issue of defendant's guilt or innocence. N.C.G.S. § 15A-1443(a) (1988).

Defendant puts forward several assignments of error arising out of the testimony of two psychologists. The first, Dr. J. Thomas Stack, a clinical psychologist, testified that he had conducted a number of diagnostic interviews of defendant and that he found her to be candid, cooperative, of at least average intelligence, and notably submissive. The district attorney objected that the witness's testimony reflecting submissiveness was not relevant, and the trial court dismissed the jury in order to conduct a voir dire. Asked further about defendant's submissive personality trait, Dr. Stack explained that defendant's history as the wife of two abusive husbands had left an imprint on her personality characteristic of "battered woman syndrome." At the conclusion of the voir dire, the court determined that the witness's proffered testimony regarding defendant's submissiveness could be viewed by the jury as corroborative of defendant's own earlier testimony that she "just went along with Bacon," and that "she didn't care anymore."

Dr. Stack then testified extensively before the jury, explaining his diagnosis that, at the time of her husband's murder, defendant was under the influence of an "adjustment reaction" to her years of abuse. This was exhibited generally as a kind of emotional torpor, in which helplessness, submissiveness, and vulnerability were dominant features.

Dr. Stack reported that he had diagnosed defendant as suffering from a disorder he characterized as post-traumatic stress syndrome. He testified in addition that defendant's emotional state at the time of her husband's death was consistent with the disorder known as "battered woman syndrome." Dr. Stack concluded that the effect of these disorders upon defendant's personality was a submissiveness and "vulnerability" so pervasive and overwhelming that one so affected would respond "like a robot" to another's instructions or threats.

Following the testimony of Dr. Stack, defendant offered that of a second clinical psychologist, Dr. Alexander Bory, who on voir dire gave his conclusions concerning a number of psychological tests that had been administered to defendant. Based upon these tests and subsequent interviews, Dr. Bory, like Dr. Stack, recognized in defendant characteristics of the battered woman syndrome, and he observed in defendant's personality "much passivity and a great deal of dependence" and a "need drive" to be controlled. Direct examination of Dr. Bory on voir dire included the following dialogue:

> Q. Doctor, do you have an opinion satisfactory to yourself, and based upon a reasonable degree of psychiatric certainty, whether or not on the night of February 1, 1987, the defendant formed the specific intent to kill Glennie Clark?
>
>     . . . .
>
> A. Yes, I do.
>
> Q. All right sir, what is that opinion, Doctor?
>
> A. That she had diminished capacity to think logically and clearly at that time.
>
> Q. What effect, Doctor, did that have on her to form or not form a specific intent to kill her husband; that is the question.
>
> A. I'm not sure I understand the question.
>
> Q. The question is, do you have an opinion as to whether she formed that intent—first, you said you had an opinion?
>
> A. That is correct.

Q. What is your opinion on her ability to form that specific intent?

A. I believe that instead of specific intent, it was more of a fantasy, it just was a derealization; she just would tend to fantasize about that. I don't for a minute believe that she thought the actual act would take place, but that is purely —that is purely my opinion; that is pure conjecture.

At the conclusion of the voir dire, the district attorney challenged the relevance of Dr. Bory's testimony, as he had that of Dr. Stack. The trial court concluded that although Dr. Bory's testimony was relevant, it had "gone beyond" that of Dr. Stack, and its probative value was exceeded by its potential prejudicial effect. The trial court elaborated, finding that defendant's questions sought from Dr. Bory

[f]irstly . . . an opinion . . . about the substance of whether or not on February 1, 1987, the defendant formed a specific intent to kill; secondly, that the defendant acted with the same intent to kill that Robert Bacon had when he did the act, and thirdly, whether or not the mental condition was affected by Robert Bacon.

The trial court then ruled that Dr. Bory's testimony was inadmissible because "it invades the province of the jury."

[6] The trial court's concern with the fact that, as an "opinion of whether or not the defendant was able to formulate the prerequisite intent," the proffered testimony invaded "the province of the jury" was misplaced. *See State v. Wilkerson*, 295 N.C. 559, 568-69, 247 S.E. 2d 905, 911 (1978). Further, as defendant correctly notes, it has been vitiated by statute. The North Carolina Rules of Evidence state that "[t]estimony in the form of an opinion or inference is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." N.C.G.S. § 8C-1, Rule 704 (1988). In the context of expert testimony regarding the mental condition of a defendant at the time of the crime, this Court has noted that Rule 704 "plainly provides that an expert witness is not precluded from testifying as to whether a defendant had the capacity to make and carry out plans, or was under the influence of mental or emotional disturbance, merely because such testimony relates to an ultimate issue to be decided by the trier of

fact." *State v. Shank*, 322 N.C. 243, 249, 367 S.E. 2d 639, 644 (1988).

[7]   We find, however, that Dr. Bory's proffered testimony was properly excluded, albeit for another reason. Dr. Bory's responses to questions on voir dire were liberally laced with disclaimer and equivocation. By his own admission, his conclusions regarding defendant's mental condition the day of the murder were "purely speculation" and "conjecture," and he indicated no comprehension of the legal significance of "specific intent." Such testimony was thus accurately characterized by the trial court as expert opinion that would *not* have "assist[ed] the trier of fact to understand the evidence or to determine a fact in issue." N.C.G.S. § 8C-1, Rule 702 (1988).

With regard to Dr. Stack's testimony, defendant also contends that the trial court erred in failing to include these requested instructions concerning the effect of her mental condition on her ability to form specific intent to kill on the day of the murder:

> [T]he jury is instructed that in considering the question of specific intent to kill, or lack of specific intent to kill, on the part of the defendant, and the question of whether the defendant shared the same criminal purpose of Robert Bacon, Jr., in the commission of the crime, it should consider the entire personality of the Defendant, her mental, nervous, emotional and physical characteristics as developed in the case. If the jury finds from the evidence that there was such a degree of mental unsoundness existing at the time of the death of Glennie Leroy Clark as to render the Defendant incapable of forming the specific intent to kill as the jury believes the circumstances of this case would reasonably impute to a woman of sound mind, they may consider the degree of mental unsoundness in determining the question of whether the act was first degree murder or second degree murder.

It is the duty of the trial court generally "to declare and explain the law arising on the evidence and to instruct according to the evidence." *State v. Maness*, 321 N.C. 454, 462, 364 S.E. 2d 349, 353 (1988). It is a well-established rule that when a request is made for a specific instruction "which is correct in itself and sup-

ported by evidence, the trial judge, while not required to parrot the instructions . . . must charge the jury in substantial conformity to the prayer." *State v. Davis*, 291 N.C. 1, 14, 229 S.E. 2d 285, 294 (1976) (quoting *State v. Bailey*, 254 N.C. 380, 386, 119 S.E. 2d 165, 170 (1961)). In determining whether to give the substance of an instruction concerning a defense, such as that requested by defendant, the trial court must therefore assess the evidence first for the legal principles it implicates, and second for the sufficiency of the evidence itself.

The instruction requested by defendant met the first prong of this test: it included a correct statement of the law regarding a "mental condition which could have been found to negate the capacity to premeditate and deliberate." *State v. Shank*, 322 N.C. at 250, 367 S.E. 2d at 644.

The second prong of the trial court's test for whether the evidence mandates an instruction requires that the court measure the substantiality of the evidence. "Where a defendant's evidence discloses facts which are legally sufficient to constitute a defense to the crime with which he or she has been charged, the court is required to instruct the jury as to the legal principles applicable to that defense." *State v. Strickland*, 321 N.C. 31, 40, 361 S.E. 2d 882, 887 (1987). The measure of what is "legally sufficient," however, depends upon the defense asserted. For example, this Court has held that a defendant's mere production of evidence that he was intoxicated at the time of the offense is not sufficient to mandate an instruction on the issue of whether he was so intoxicated by the voluntary consumption of alcohol that he did not form a deliberate and premeditated intent to kill. *State v. Mash*, 323 N.C. 339, 372 S.E. 2d 532 (1988). In evaluating whether a defendant is entitled to such an instruction, the trial court must instead inquire whether the evidence shows "that at the time of the killing the defendant's mind and reason were so completely intoxicated and overthrown as to render him *utterly incapable* of forming a deliberate and premeditated purpose to kill." *Id.* at 346, 372 S.E. 2d at 536 (emphasis added) (quoting *State v. Medley*, 295 N.C. 75, 79, 243 S.E. 2d 374, 377 (1978)).

The high threshold for adjudging whether the evidence merits an instruction on the law has long been considered the rule for cases in which voluntary intoxication is offered as a

defense to murder in the first degree. *See, e.g., State v. Mash,* 323 N.C. 339, 372 S.E. 2d 532; *State v. Shelton,* 164 N.C. 513, 79 S.E. 883 (1913); *State v. Murphey,* 157 N.C. 614, 72 S.E. 1075 (1911). The "utterly incapable" threshold and the legal principle that voluntary intoxication is no legal excuse for crime, *e.g., State v. Baldwin,* 276 N.C. 690, 174 S.E. 2d 526 (1970), reflect this Court's recognition of the public policy of this state.

However, for cases in which the defendant offers evidence in support of a defense or mitigation that was *beyond* his control, the test has been less rigorous. This Court has noted that a person is entitled to an instruction on self-defense, for example, "when there is any evidence in the record that it was necessary or reasonably appeared to be necessary to kill in order to protect himself from death or great bodily harm." *State v. Bush,* 307 N.C. 152, 160, 297 S.E. 2d 563, 569 (1982). The general rule mandating instruction on a lesser included offense is similarly that any evidence tending to show the commission of a crime of lesser degree mandates a charge upon the underlying law: "The sole factor determining the judge's obligation to give such an instruction is the presence, or absence, of any evidence in the record which might convince a rational trier of fact to convict the defendant of a less grievous offense." *State v. Peacock,* 313 N.C. 554, 558, 330 S.E. 2d 190, 193 (1985) (quoting *State v. Wright,* 304 N.C. 349, 351, 283 S.E. 2d 502, 503 (1981)).

When a defendant presents evidence of a mental condition that she contends rendered her incapable of forming the specific intent to kill, neither the "utterly incapable" intoxication test nor the "any evidence" test for self-defense is an appropriate measure of the legal sufficiency of the evidence for purposes of whether to instruct the jury on that issue. Where the defendant's mental defect was beyond his or her control, the policy reasons for posing the higher, "utterly incapable" standard of voluntary intoxication cases do not apply. On the other hand, the trial court should never give instructions that are not supported by a reasonable view of the evidence. *State v. Lampkins,* 283 N.C. 520, 196 S.E. 2d 697 (1973). The rationale has been stated recurrently by this Court: "[E]vidence which merely shows it possible for the fact in issue to be as alleged, or which raises a mere conjecture that it was so, is an insufficient foundation for a verdict, and should not be left to the jury." *State v. Vinson,* 63 N.C. 335, 338 (1869),

*quoted in State v. Lampkins*, 283 N.C. at 524, 196 S.E. 2d at 699; *State v. Gaskins*, 252 N.C. 46, 48-49, 112 S.E. 2d 745, 747 (1960). That "such facts and circumstances as raise only a conjecture or suspicion ought not to be allowed to distract the attention of juries from material matters," *Pettiford v. Mayo*, 117 N.C. 27, 28, 23 S.E. 252, 253 (1895), is particularly pertinent when evidence of defendant's mental condition at the time of the killing is implicated.

[8]  We hold that when a defendant requests the trial court to instruct the jury that it may consider the mental condition of the defendant in deciding whether she formed a premeditated and deliberate specific intent to kill the victim, there must be sufficient evidence "reasonably to warrant inference of the fact at issue." *Id.* at 29, 23 S.E. at 253. The proper test is whether the evidence of defendant's mental condition is sufficient to cause a reasonable doubt in the mind of a rational trier of fact as to whether the defendant was capable of forming the specific intent to kill the victim at the time of the killing.

[9]  Under this test, we conclude that the trial court in the case sub judice did not err in refusing to instruct the jury that it could consider evidence of defendant's mental disorder as rendering her incapable of forming the specific intent to kill. We bottom this conclusion on a comparison of the substantiality of the evidence in this case with that in *State v. Rose*, 323 N.C. 455, 373 S.E. 2d 426 (1988). In *Rose* the defendant presented the testimony of a forensic psychiatrist that at the time of the murder defendant had been experiencing a psychotic episode caused by an old head injury and by chronic stress, which prevented him from being capable of forming the specific intent to kill. This Court held that the trial court had properly determined this testimony admissible under Rule 704 of the North Carolina Rules of Evidence and that, as such, defendant was entitled to a jury instruction on this element of the crime. In the case sub judice, however, Dr. Stack testified as to an endemic mental condition, but he never suggested that defendant's disorder might have rendered her incapable of forming a premeditated and deliberate specific intent to kill. Further, the mental defects are themselves distinguishable insofar as, in *Rose*, a physical injury initiated the change in the defendant's personality that his expert witness testified rendered him incapable of forming specific intent, whereas in the case sub judice,

the evidence presented by defendant tended to show that her personality disorder had affected her since childhood. Although that disorder appeared to have been exacerbated by the experience of living with abusive, domineering males, defendant had actually twice extricated herself from such situations by moving out. Furthermore, defendant not only physically accompanied Bacon when the latter stabbed her husband, but she arranged the rendezvous and drove the car. The evidence was insufficient to cause a reasonable doubt in the mind of a rational trier of fact as to whether the defendant was capable of forming the premeditated and deliberate specific intent to kill her husband.

[10] Based in large part upon her contention that because of her mental defect she was incapable of forming the specific intent to kill, defendant argues that there was sufficient evidence to support an instruction on murder in the second degree and that the trial court erred in failing to so instruct. Murder in the second degree is the unlawful killing of a human being with malice but without premeditation and deliberation. *State v. Robbins*, 309 N.C. 771, 309 S.E. 2d 188 (1983). A specific intent to kill, while a necessary constituent of the elements of premeditation and deliberation in first degree murder, is not an element of murder in the second degree or of manslaughter. *State v. Alston*, 295 N.C. 629, 247 S.E. 2d 898 (1978).

In addition to testimony concerning her mental condition, which defendant avers is evidence that she was incapable of forming the specific intent to kill, defendant cites her own testimony that she tried numerous times to talk Bacon out of his intention to kill defendant's husband, and that she behaved more or less robotically, allowing Bacon to make the decisions and "just doing what he told" her.

This Court has stated that "when the State's evidence is clear and positive with respect to each element of the offense charged and there is no evidence showing the commission of a lesser included offense, it is not error for the trial judge to refuse to instruct on the lesser offense." *State v. Hardy*, 299 N.C. 445, 456, 263 S.E. 2d 711, 718-19 (1980). "The *presence* of evidence tending to show commission of a crime of lesser degree is the determinative factor." *State v. Poole*, 298 N.C. 254, 260, 258 S.E. 2d 339, 343 (1979) (Huskins, J., dissenting), *quoted in State v.*

*Strickland,* 307 N.C. 274, 298 S.E. 2d 645 (1983) (Martin, J., concurring). *See also State v. Wrenn,* 279 N.C. 676, 185 S.E. 2d 129 (1971).

Evidence presented by the state *and* by defendant, including testimony that defendant knew (and for some period of time had known) of Bacon's intent to kill her husband, that she arranged for Bacon to be in the same place at the same time as her husband, and that she was also present at the time of the killing, clearly and positively supported the jury's finding beyond a reasonable doubt that the state had proven each element of the charge of murder in the first degree. The "mere possibility" that the jury might find that a defendant did not premeditate or deliberate — or that she could not form the specific intent to kill — does not lead to the assumption that defendant could be guilty of a lesser offense. *State v. Strickland,* 307 N.C. at 293, 298 S.E. 2d at 658. Here "the evidence belies anything other than a premeditated and deliberate killing." *Id.* The evidence as to each element of the offense charged was clear and positive and not contradicted by any evidence sufficient to cause a rational trier of fact to doubt the state's proof of that element. We hold that the trial court did not err in refusing to charge the jury on murder in the second degree.

[11] Defendant also assigns error in the guilt-innocence phase of her trial for murder to the verdict form submitted to the jury, which proposed two possible verdicts: "Guilty of Murder in the First Degree by Aiding and Abetting," or "Not Guilty." Defendant suggests that the expression of the legal theory upon which a first degree murder conviction would rest placed undue emphasis on that choice, amounting to an expression of the opinion of the trial judge in violation of N.C.G.S. § 15A-1232 (1988). Defendant surmises that in addition, the surplusage may have confused the jury.

The Official Commentary to N.C.G.S. § 15A-1237, which requires that a jury's verdict be in writing, signed by the foreman, and entered in the record of the case, states simply: "It is contemplated that the jury will be given a verdict form setting out the permissible verdicts recited by the judge in his instructions." The trial court in the case sub judice instructed the jury that

[T]he defendant . . . has been accused of murder in the first degree, which is the unlawful killing of a human being with malice and with premeditation and with deliberation. However, a person may be guilty of first degree murder, although she personally does not do any of the acts necessary to constitute murder in the first degree. Now a person who aids and abets another to commit murder in the first degree is guilty of that crime. You must clearly understand that if she does aid and abet, she is guilty of murder in the first degree just as if she had personally done all of the acts necessary to constitute that crime.

The trial court proceeded scrupulously and at length to outline the elements necessary for proof of both murder in the first degree and murder in the first degree by aiding and abetting, consistently linking the first offense with evidence regarding Bacon and the second with evidence regarding defendant. The phrase "murder in the first degree by aiding and abetting" was repeated more than once in the trial court's jury charge.

In *State v. Goodman*, 298 N.C. 1, 257 S.E. 2d 569 (1979), this Court approved the trial court's specification on the verdict form of underlying theories for murder in the first degree as based upon felony murder or upon premeditation and deliberation. The Court's rationale was that such specification aided the sentencing court to avoid imposing additional punishment on the underlying felony if the jury found the defendant guilty based upon felony murder. Although in this case, appending the basis for murder in the first degree was not necessary for purposes of sentencing, as it was in *Goodman*, the trial court's doing so was supported by N.C.G.S. § 15A-1237 as construed in *Goodman*. Defendant's further contention that appending the legal theory onto the offense charged confused the jury is manifestly without merit. Defendant compares her case to *State v. Lee*, 292 N.C. 617, 234 S.E. 2d 574 (1977), in which this Court found error in submitting a possible verdict of "first degree murder in which a deadly weapon is used." In such a case, the jury could have inferred that proof of the use of a deadly weapon was sufficient to prove murder in the first degree, without proof of premeditation and deliberation. Clearly, the comparison with the case sub judice fails: The possible verdict submitted to the jury here could not have fomented

confusion in the jury as to the elements of the offense charged; on the contrary, its obvious effect was to clarify.

[12]   As preface to the parties' closing arguments, the trial judge informed those in the courtroom that he was concerned that the jury not be distracted by the movement of spectators in and out of the room. He consequently warned them that if they wished to leave the courtroom, they should do so immediately, for they would not be allowed to do so after closing arguments began, barring an emergency. Defendant perceives this order as a denial of a "public trial," in violation of the sixth amendment to the United States Constitution and in violation of article I, section 18 of the North Carolina Constitution, which requires that "[a]ll courts shall be open." *See also* N.C. Const. art. I, § 24.

Defendant exaggerates the facts. The trial judge warned the spectators of his intention to restrict public egress for a limited period of time. He did not vacate the courtroom nor bar the courtroom door without due warning to those within and without. The presiding judge is authorized by statute to "impose reasonable limitations on access to the courtroom when necessary to ensure the orderliness of courtroom proceedings." N.C.G.S. § 15A-1034(a) (1988). This was the precise intention announced by the trial judge, and we find absolutely no impropriety in his having done so.

[13]   Defendant also assigns error to two questions posed by the district attorney during cross-examination of defendant. In an apparent attempt to undercut defendant's testimony about her abuse at the hands of first a husband who was a drug addict, then one who was an alcoholic, the district attorney asked, "Well, you sort of enjoyed smoking marijuana, didn't you?" Defendant's objection was overruled and defendant responded, "I did on occasion, sir."

The district attorney's question was a bald attempt to attack defendant's credibility with a specific instance of reprehensible conduct short of a conviction. This is prohibited under the North Carolina Rules of Evidence except when such evidence is probative of the witness's credibility. *See* N.C.G.S. § 8C-1, Rule 608(b) (1988). There can be no question that defendant's admission to having smoked marijuana had no conceivable tendency to prove or disprove her truthfulness. *State v. Morgan*, 315 N.C. 626,

340 S.E. 2d 84 (1986); *State v. Rowland,* 89 N.C. App. 372, 366 S.E. 2d 550 (1988), *rev. dismissed,* 323 N.C. 619, 374 S.E. 2d 116 (1988) (cross-examination concerning drug addiction standing alone not probative of defendant's character for truthfulness or untruthfulness). The question and its elicited response were also barred by N.C.R. Evid. 404(b), which prohibits evidence of other crimes, wrongs, or acts to prove the defendant acted in conformity with a character trait those acts exhibit. Neither motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident is implied by defendant's admitted act of smoking marijuana. N.C.G.S. § 8C-1, Rule 404(b) (1988).

The trial court's failure to sustain defendant's objection here was error. However such an error is reversible on appeal only "when there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at trial." N.C.G.S. § 15A-1443(a) (1988). We can conceive of no such possibility in this case. Overwhelming evidence of defendant's guilt was presented by the state and buttressed by defendant's own testimony. *See State v. Gardner,* 316 N.C. 605, 342 S.E. 2d 872 (1986). In addition, although the fact that defendant may have smoked marijuana might have weakened her characterization as a bystander psychologically injured by a series of drug-abusing males, it had no effect upon the jury's assessment of her personality, as is apparent in the jury's having found as a factor in mitigation of her sentence that defendant's involvement in the killing of her husband had been the product of long-term abuse and emotional disturbance.

At the sentencing hearing for murder in the first degree the jury found the single statutory aggravating circumstance that the murder had been especially heinous, atrocious, or cruel. N.C.G.S. § 15A-2000(e)(9) (1988). The jury found the statutory mitigating circumstance that the murder had been committed while defendant was under the influence of mental or emotional disturbance. N.C.G.S. § 15A-2000(f)(2) (1988). In addition, the jury found the following circumstances that it deemed to have mitigating value: that defendant had no prior history of violent or assaultive conduct, and that defendant had no record of criminal convictions or that she had a record consisting solely of misdemeanors punishable by not more than sixty days' imprisonment (*see* N.C.G.S.

§ 15A-2000(f)(1) ); that defendant was vulnerable due to her sense of hopelessness and dependence; that her involvement in the capital felony was the product of long-term abuse and emotional disturbance and the chance involvement with Robert Bacon, Jr.; that all of the victim's wounds had been inflicted by Robert Bacon, Jr.; that at an early stage of the criminal process, defendant had made an oral and written statement confessing her involvement in the capital felony; that defendant was the mother of two children and that up to 1 February 1987 she had had primary responsibility for raising them; that defendant's past behavior indicated the likelihood that she would be able to adapt to prison life in the future; that defendant had displayed good behavior since being placed in jail; that defendant would not pose a danger to society if spared the death penalty; that prior to this capital felony defendant had enjoyed a good character reputation; and that "[an]other circumstance or circumstances arising from the evidence" existed that had mitigating value. Based upon these findings, the jury determined that the mitigating circumstances were sufficient to outweigh the aggravating circumstance and recommended that defendant be sentenced to life imprisonment.

[14] Defendant also takes issue on appeal with regard to the sentence imposed for conviction of conspiracy to commit murder. Defendant was sentenced to ten years' imprisonment, a period of incarceration seven years in excess of the presumptive term for this offense, a Class H felony. N.C.G.S. § 14-2.4(2) (1986); N.C.G.S. § 15A-1340.4(f)(6) (1988). A sentencing court may impose a prison term in excess of the presumptive term for a felony governed by the Fair Sentencing Act only after "consideration of aggravating or mitigating factors, or both." N.C.G.S. § 15A-1340.4(a) (1988). In the case sub judice the sentencing court found as factors in aggravation of the offense of conspiracy to commit murder that defendant had induced others to participate in the commission of the offense, N.C.G.S. § 15A-1340.4(a)(1)(a) (1988), and that the offense was especially heinous, atrocious or cruel, N.C.G.S. § 15A-1340.4(a)(1)(f) (1988). The court found in addition several mitigating factors, but despite uncontradicted evidence presented through defendant's testimony that she had twice been honorably discharged from the armed forces, the court failed to find this statutory mitigating factor. N.C.G.S. § 15A-1340.4(a)(2)(o) (1988).

The sentencing court has a duty to find a statutory mitigating factor when the evidence in support of that factor is uncontradicted, substantial, and manifestly credible. *State v. Spears*, 314 N.C. 319, 333 S.E. 2d 242 (1985). Defendant's testimony on direct examination that she had been honorably discharged from the Marine Corps on two separate occasions was uncontradicted by the state. We hold that the sentencing court's failure to find this mitigating factor was error. Whenever there is such error and a sentence in excess of the presumptive term is imposed, the case must be remanded for a new sentencing hearing. *State v. Daniel*, 319 N.C. 308, 354 S.E. 2d 216 (1987). In concluding that defendant is so entitled, we find it unnecessary to discuss defendant's further assignments of error, including her contention that the trial court erred in finding the factor in aggravation of conspiracy to commit murder that the offense was especially heinous, atrocious, or cruel, upon which we express no opinion.

87CRS1845—murder in the first degree—no error.

87CRS1846—conspiracy to commit murder—new sentencing hearing.

Justice WEBB dissenting.

I dissent. The defendant contended she was unable to form an intent to kill. She offered the testimony of Dr. Alexander Bory on this issue. It is worth noting that Dr. Bory did not have to be an expert to give his opinion as to the defendant's mental condition at the time of the killing. The majority says that this testimony would not have assisted the jury to determine a fact in issue because of the speculative and equivocal nature of Dr. Bory's testimony. Dr. Bory would have testified without equivocation that in his opinion the defendant "had diminished capacity to think logically and clearly at" the time of the killing. This testimony was relevant and should have been admitted. He would also have testified in regard to the defendant's ability to form an intent at the time of the killing, that in his opinion "that instead of specific intent, it was more of a fantasy." After explaining what he meant by using the word "fantasy" Dr. Bory then said "but . . . that is purely my opinion; that is pure conjecture." This is apparently the testimony upon which the majority relies to say

his testimony was speculative. I believe a reading of Dr. Bory's proposed testimony shows that it was his opinion that the defendant could not form the specific intent to kill. He recognized the difficulty in forming such an opinion and said so. It was for the jury to determine the weight of Dr. Bory's testimony. I believe it was error to exclude it.

I also believe it was error for the court not to give the requested instruction as to the defendant's ability to form the specific intent to kill. The majority says, "Where a defendant's evidence discloses facts which are legally sufficient to constitute a defense to the crime with which he or she has been charged, the court is required to instruct the jury as to the legal principles applicable to that defense." *State v. Strickland*, 321 N.C. 31, 40, 361 S.E. 2d 882, 887 (1987). I do not believe this question should be resolved as if the defendant were attempting to interpose a defense which would justify the killing. The burden was on the State to prove an intent to kill and the defendant offered evidence in an attempt to negate this proof by the State. The defendant was not trying to prove a defense which would justify the killing.

The majority, having characterized the defendant's position as an attempt to present a defense which would justify the killing, purports to establish a new rule as to when evidence of this defense requires a jury instruction. Rejecting what it calls the "utterly incapable" test for charging on intoxication as a defense and the "any evidence" test for charging on self-defense, the majority says, "[t]he proper test is whether the evidence of defendant's mental condition is sufficient to cause a reasonable doubt in the mind of a rational trier of fact as to whether the defendant was capable of forming the specific intent to kill the victim at the time of the killing." The majority then evaluated all the evidence, including evidence that the defendant had previously extricated herself from the dominance of males and that she arranged the rendezvous and accompanied Bacon when the stabbing occurred. The majority then concluded there was insufficient evidence to cause a reasonable doubt in the mind of a rational trier of fact as to whether the defendant was capable of forming an intent to kill.

I believe it is error for us to evaluate all the evidence in determining whether there is enough evidence to submit a charge to

the jury on the defendant's ability to form an intent to kill. This is a departure from any practice of this Court of which I am aware. There was certainly no intimation of it in two recent cases which dealt with this subject. *See State v. Rose*, 323 N.C. 455, 373 S.E. 2d 426 (1988); *State v. Shank*, 322 N.C. 243, 367 S.E. 2d 639 (1988).

I believe that if there is competent evidence that a defendant was not capable of forming a specific intent to kill the court should charge on this feature. In this case Dr. J. Thomas Stack, a clinical psychologist, testified to the defendant's emotional state at the time of the killing. He testified that one so vulnerable would respond "like a robot" to another's instructions. A robot does not have a mind of its own. If defendant did not have a mind of her own but simply responded to others, this is evidence she did not form a specific intent to kill. I also believe the testimony of Dr. Bory, which I would hold was erroneously excluded, was evidence the defendant did not form a specific intent to kill. I would hold that it was error for the court not to give the requested charge.

For the above reasons, I also believe it was error not to charge on second degree murder.

I vote for a new trial.