STATE OF NORTH CAROLINA v. RANDY DALE PERRY

No. 553A93

(Filed 9 December 1994)

## 1. Homicide § 495 (NCI4th)— murder—evidence of anger— instruction on second-degree murder not given—no error

The trial court did not err in a first-degree murder prosecution by not instructing on second-degree murder where defendant contended that the evidence tended to show that he acted in extreme anger and that his actions were provoked by the acts of the victim and his companions. Although the evidence cited by the defendant would support the inference that he was angry when he shot the victim, it would not support a reasonable finding that his faculties or ability to reason were disturbed to the point of negating his ability to premeditate or deliberate. Uncontroverted evidence tended to show that he rationally proceeded towards revenge, exacted his revenge, and fled the scene fully aware of what he had done.

**Am Jur 2d, Homicide § 501.**

Homicide: presumption of deliberation or premeditation from the circumstances attending the killing. 96 ALR2d 1435.

2. **Homicide § 520 (NCI4th)— murder—intent to frighten victim—instruction given—no error**

The trial court did not err in a first-degree murder prosecution by not instructing on second-degree murder where defendant argued that the jury could have found from evidence of bullet marks at the scene that he only intended to frighten the victim, who was killed by ricocheting bullets. The evidence did not support a reasonable finding that defendant only intended to frighten the victim, particularly in light of the fact that three of the shots the defendant fired hit the victim, two other men on the porch were not hit, and defendant unambiguously stated that he intended to shoot the victim.

Am Jur 2d, Homicide § 500.

Homicide: presumption of deliberation or premeditation from the circumstances attending the killing. 96 ALR2d 1435.

3. **Homicide § 555 (NCI4th)— murder—defendant's mental illness—no instruction on second-degree murder**

The trial court did not err in a first-degree murder prosecution by not giving an instruction on second-degree murder where defendant argued that he lacked the mental capacity to form a premeditated and deliberate specific intent to kill due to his mental illness. Although a nurse at the jail testified that defendant appeared agitated, somewhat tearful, and delusional when she saw him, and the nurse and a psychiatrist at Dorothea Dix testified that he was manic-depressive, there was no evidence to support a reasonable finding that the defendant's mental condition impaired his ability to premeditate and deliberate or to form a specific intent to kill on the night of the murder. Being agitated and tearful upon arriving at the jail would not be unusual for someone charged with first-degree murder. The psychiatrist testified that defendant's disorder was episodic in nature and the episode in which the doctor found him may or may not have existed prior to or during the murder. The jury would have been required to engage in mere speculation had it been instructed on second-degree murder.

Am Jur 2d, Homicide § 501.

**4. Homicide § 588 (NCI4th)— first-degree murder—imperfect self-defense—instruction on voluntary manslaughter not given**

The trial court did not err in a first-degree murder prosecution by not instructing on voluntary manslaughter based on imperfect defense of another where the evidence at trial tended to support two alternate versions of events surrounding the killing; the evidence supporting the first version did not support the requested instructions because it would only support a finding that the threat to the defendant's brother had passed and would not support a rational finding that the defendant in fact believed it necessary to kill the deceased to save his brother or that any such belief was reasonable at the time the defendant shot the victim; and, under the second version, defendant's brother would have been justified in using deadly force to repel the attack and an instruction on imperfect self-defense would not be justified.

**Am Jur 2d, Homicide §§ 519 et seq.**

**5. Homicide § 583 (NCI4th)— first-degree murder—instructions—acting in concert**

The trial court did not err in a first-degree murder prosecution by instructing the jury on acting in concert where defendant's brother testified that when he was threatened the defendant and Scottie Thompson appeared on the scene and began to shoot at his assailants in a concerted effort to protect him; either the defendant or Scottie Thompson fired the fatal bullets; and evidence that Thompson disposed of the defendant's weapon after the killing also tended to show that the defendant was acting in concert with Thompson. Defendant's contention that some evidence tended to show that he and Thompson were lawfully acting in defense of his brother was not determinative of the issue.

**Am Jur 2d, Homicide § 507.**

**6. Homicide § 252 (NCI4th)— first-degree murder—premeditation and deliberation—sufficiency of evidence**

The trial court did not err in a first-degree murder prosecution by denying defendant's motion to dismiss the charge of first-degree murder due to insufficient evidence of premeditation and deliberation where the evidence supported two alternative versions of the events on the night the victim was killed but the

defendant's statements to the effect that he shot the victim to retaliate for the victim's earlier threats to the defendant's brother were clearly sufficient evidence from which the jury reasonably could have inferred that the defendant intentionally killed the victim after premeditation and deliberation.

**Am Jur 2d, Homicide §§ 437 et seq.**

**Homicide: presumption of deliberation or premeditation from the circumstances attending the killing. 96 ALR2d 1435.**

7. **Evidence and Witnesses § 761 (NCI4th)— first-degree murder—testimony concerning bullet mark and direction from which shot fired—excluded—no prejudice**

There was no prejudice in a first-degree murder prosecution from the court's exclusion of testimony concerning a bullet mark on the porch of the apartment where the killing occurred and the direction from which the bullet came where there was other testimony to the same effect and there was nothing particularly significant about the direction from which the shots were fired.

**Am Jur 2d, Appeal and Error § 806.**

8. **Evidence and Witnesses § 1298 (NCI4th)— first-degree murder—defendant's statement to officer—waiver of rights—mental condition**

The trial court did not err in a first-degree murder prosecution by not suppressing defendant's statement to an officer where a psychiatrist testified concerning defendant's history of manic episodes but could not give an opinion as to whether defendant understood his rights at the time he gave his inculpatory statement to the officer, and a nurse who saw defendant several hours after he was arrested testified that he was upset, tense, and nervous and in her opinion delusional and could not have understood his rights, but also testified that he was able to understand the questions asked of him and that he responded in a reasonable manner to those questions. There was substantial competent evidence to support the trial court's finding that the defendant understood his constitutional rights at the time he waived them.

**Am Jur 2d, Evidence § 744.**

STATE v. PERRY

[338 N.C. 457 (1994)]

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of life imprisonment entered by Helms, J., on 9 September 1993 in Superior Court, Union County, upon a jury verdict finding the defendant guilty of murder in the first degree. Heard in the Supreme Court on 15 September 1994.

*Michael F. Easley, Attorney General, by Jane R. Garvey, Assistant Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Charlesena Elliot Walker, Assistant Appellate Defender, for the defendant-appellant.*

MITCHELL, Justice.

The defendant, Randy Dale Perry, was indicted for murder and tried noncapitally at the 7 September 1993 Criminal Session of Superior Court, Union County. The jury returned a verdict on 9 September 1993 finding the defendant guilty of murder in the first degree. The trial court imposed a mandatory life sentence. The defendant appealed to this Court as a matter of right.

The evidence admitted at trial tended to show, *inter alia*, that on 5 July 1992, the victim, Merced Xaltipa Vergara, visited relatives and friends at an apartment on Kerr Street in Monroe, North Carolina. Benjamin Rodricuz was also at the apartment that evening. Rodricuz testified that he was standing on the porch of the apartment at approximately 9:00 p.m. with the victim and two other men. A group of men walked by and said something to them. Rodricuz then stepped into the apartment and his wife called for the other men to come inside. Shortly after she called to the men, shots were fired and the victim exclaimed that he had been shot. The victim soon died from three gunshot wounds.

Between 10:00 p.m. and 11:00 p.m. that same evening, Paulette Bolden was in the area of the shooting to visit her brother. When she saw police cars and an ambulance she walked over to find out what was going on. As she was leaving the area, she saw the defendant come out from behind "the apartments where the Mexicans stayed." The defendant said he wanted her to get him out of the area "[b]ecause I done shot the M.F. and I'll shoot him again . . . because he was F——ing with my brother." Ms. Bolden then took the defendant to a friend's house. The next morning the police contacted Ms. Bolden and she gave a statement recounting the previous night's events.

STATE v. PERRY

[338 N.C. 457 (1994)]

Following further investigation, Monroe Police Department Lieutenant Frank Benton went to the defendant's home on 7 July 1992. After being summoned by his father, the defendant walked up to Lieutenant Benton and said, "I've been waiting for you all since yesterday." Lieutenant Benton and the defendant then left for the police station where the defendant gave a statement after being read his rights. In the statement the defendant said that he was visiting a friend on the night of the murder when his brother arrived. The defendant's brother, William Perry, told him that a Mexican had put a shotgun to his head and threatened his life. The defendant was already angry because another brother had been shot the day before by a bondsman who had also beaten up the defendant. The defendant went home and got his .22 caliber rifle and then went to the area where the Mexicans lived. He stated that when he saw the victim on a porch holding a shotgun, he took aim and fired at the victim four or five times. After shooting at the victim, he fled the scene. He saw Paulette Bolden and got a ride with her to a friend's home nearby. Additional evidence is discussed in this opinion as necessary to resolve the issues raised here by the defendant.

[1] In the defendant's first assignment of error, he contends that the trial court erred by failing to instruct on murder in the second degree. Premeditated murder in the first degree is defined as "the intentional and unlawful killing of a human being with malice and with premeditation and deliberation." *State v. Hamlet*, 312 N.C. 162, 169, 321 S.E.2d 837, 842 (1984). The defendant does not challenge the trial court's instructions on murder in the first degree. The lesser included offense of murder in the second degree is defined as the unlawful killing of another with malice, but without premeditation and deliberation. *State v. Fleming*, 296 N.C. 559, 562, 251 S.E.2d 430, 432 (1979). In determining the propriety of giving an instruction on a lesser included offense, "[t]he test is whether there 'is the presence, or absence, of any evidence in the record which might convince a rational trier of fact to convict the defendant of a less grievous offense.'" *State v. Thomas*, 325 N.C. 583, 594, 386 S.E.2d 555, 561 (1989) (quoting *State v. Wright*, 304 N.C. 349, 351, 283 S.E.2d 502, 503 (1981)).

The defendant's first argument in support of this assignment relates to circumstantial evidence tending to show his mental state. On this point the defendant argues that evidence tended to show that at the time of the killing he was angered by the beating he had received the previous day and by the earlier shooting of his younger

brother. When he learned of the threat made with the shotgun upon his other brother on the day of the murder, his anger only increased. He contends that this evidence showed that he acted in extreme anger and that his actions were provoked by the acts of the victim and his companions. Additionally, the defendant says that marks left by bullets on the porch's concrete pad and a porch post indicate that he fired the gun to frighten the victim, not to hit him, and that the deadly shots ricocheted into the victim. The defendant would have us conclude that the foregoing evidence would permit the jury to infer that anger and provocation overcame his ability to reason and consequently warranted an instruction on murder in the second degree.

Anger and emotion frequently coincide with murder, but a court should instruct on murder in the second degree only when the evidence would permit a reasonable finding that the defendant's anger and emotion were strong enough to disturb the defendant's ability to reason. *See State v. Thomas*, 332 N.C. 544, 560-61, 423 S.E.2d 75, 84 (1992). Although the evidence cited by the defendant would support the inference that he was angry when he shot the victim, it would not support a reasonable finding that his faculties or ability to reason were disturbed to the point of negating his ability to premeditate or deliberate.

The remaining circumstantial evidence all tended to show that the defendant's faculties and ability to reason were undisturbed throughout the course of his actions on the night of the murder. Such evidence tended to show that upon learning of the threat to his brother, he got a gun, concealed himself with a view of the porch, fired several rounds at the victim from his hidden vantage point, disposed of the gun and then hid until he could safely flee the area. Additionally, he told Paulette Bolden that he shot the victim, why he shot the victim, and that he would do it again if he had the opportunity. While the evidence cited by the defendant tended to show that he felt provoked and angry, uncontroverted evidence tended to show that he rationally proceeded towards revenge, exacted his revenge and fled the scene fully aware of what he had done. The evidence would not have supported a reasonable finding that his ability to reason was overcome.

[2] The defendant also argues in support of this assignment that the jury could have found that the defendant only intended to frighten the victim and, based on that finding, could have concluded that he acted without premeditation and deliberation. In support of this assertion

he points to evidence of two bullet marks on the apartment's porch. The defendant contends that this evidence supported the inference that the victim was killed by ricocheting bullets and, thus, the further inference that the defendant did not intend to hit him but only to scare him. We conclude that such evidence would not support a reasonable finding that the defendant only intended to frighten the victim, particularly in light of the fact that three of the shots the defendant fired hit the victim and the two other men on the porch were not hit. Additionally, in his statements to the police and Paulette Bolden—the only direct evidence of his intentions—he unambiguously stated that he intended to shoot the victim. A jury could not reasonably find from the evidence of two stray bullets that the defendant only intended to frighten the victim.

[3] The defendant further argues in support of this assignment of error that evidence tended to show that, due to his mental illness, he lacked the mental capacity to form a premeditated and deliberate specific intent to kill. Flora Kimbrell, a nurse at the Union County Jail saw the defendant when he was brought into the jail on 7 July 1992, more than 36 hours after the murder. She testified that he appeared "agitated, somewhat tearful" and "delusional" when she saw him. She indicated that she had experience with the defendant in the past and knew he was manic-depressive. She also indicated that she obtained approval to administer drugs and administered those drugs to alleviate his problems. Although she testified that she did not believe he possessed sufficient awareness to voluntarily consent to give a statement, her testimony did not tend to show that he did not possess the mental capacity to enable him to form a premeditated and deliberate specific intent to kill on the night of the killing. On 15 July 1992, Dr. Patricio P. Lara began a psychiatric evaluation of the defendant after the defendant was admitted to Dorothea Dix hospital. Dr. Lara testified that the defendant is manic-depressive. However, Dr. Lara stated that he did not have a sufficient basis to form an opinion as to whether the defendant was having a manic episode on the day of the murder.

In *State v. Clark*, 324 N.C 146, 377 S.E.2d 54 (1989), this Court addressed the very argument raised here by the defendant when we stated:

'[E]vidence which merely shows it possible for the fact in issue to be as alleged, or which raises a mere conjecture that it was so, is an insufficient foundation for a verdict, and should not be left to

the jury.' That 'such facts and circumstances as raise only a conjecture or suspicion ought not to be allowed to distract the attention of juries from material matters,' is particularly pertinent when evidence of defendant's mental condition at the time of the killing is implicated.

[W]hen a defendant requests the trial court to instruct the jury that it may consider the mental condition of the defendant in deciding whether she formed a premeditated and deliberate specific intent to kill the victim, there must be sufficient evidence 'reasonably to warrant inference of the fact at issue.' The proper test is whether the evidence of defendant's mental condition is sufficient to cause a reasonable doubt in the mind of a rational trier of fact as to whether the defendant was capable of forming the specific intent to kill the victim at the time of the killing.

*Id.* at 162-63, 377 S.E.2d at 64 (citations omitted).

In the case *sub judice*, there was no evidence to support a reasonable finding that the defendant's mental condition impaired his ability to premeditate and deliberate or to form a specific intent to kill on the night of the murder. Dr. Lara could not form an opinion as to the defendant's mental state on that night. Nurse Kimbrell testified that the defendant was agitated and tearful when he arrived at the jail over thirty-six hours after the murder, however, both she and Dr. Lara testified that such a reaction would not be unusual for someone charged with first-degree murder. Additionally, Dr. Lara testified that the defendant's disorder was episodic in nature—the episode in which the doctor found him may or may not have existed prior to or during the murder. Had the jury been instructed on second-degree murder based upon such evidence concerning the defendant's mental capacity, it would have been required to engage in mere speculation when reaching its conclusion on that issue. As *Clark* precludes such speculation, the evidence was insufficient to support a reasonable doubt in the mind of a rational trier of fact as to whether the defendant was capable of premeditation, deliberation or a specific intent to kill. We conclude that this assignment of error is without merit. The trial court did not err in refusing to charge the jury on murder in the second degree.

[4] The defendant next assigns error to the trial court's failure to instruct on voluntary manslaughter based on the theory that the defendant acted in the imperfect defense of another. "A person has a right to kill not only in his own self-defense but also in defense of

another." *State v. McKoy*, 332 N.C. 639, 643, 422 S.E.2d 713, 716 (1992) (citing *State v. Carter*, 254 N.C. 475, 119 S.E.2d 461 (1961)).

The elements which establish perfect self-defense are:

(1) it appeared to defendant and he believed it to be necessary to kill the deceased in order to save himself from death or great bodily harm; and

(2) defendant's belief was reasonable in that the circumstances as they appeared to him at that time were sufficient to create such a belief in the mind of a person of ordinary firmness; and

(3) defendant was not the aggressor in bringing on the affray, i.e., he did not aggressively and willingly enter into the fight without legal excuse or provocation; and

(4) defendant did not use excessive force, i.e., did not use more force than was necessary or reasonably appeared to him to be necessary under the circumstances to protect himself from death or great bodily harm.

*State v. McAvoy*, 331 N.C. 583, 595, 417 S.E.2d 489, 497 (1992) (quoting *State v. Norris*, 303 N.C. 526, 530, 279 S.E.2d 570, 572-73 (1981)). The elements of perfect defense of another are essentially the same as those for perfect self-defense. In general one may kill in defense of another if one believes it to be necessary to prevent death or great bodily harm to the other "and has a reasonable ground for such belief, the reasonableness of this belief or apprehension to be judged by the jury in light of the facts and circumstances as they appeared to the defender at the time of the killing." *State v. Terry*, 337 N.C. 615, 623, 447 S.E.2d 720, 724 (1994). "[T]he right to kill in defense of another cannot exceed such other's right to kill in his own defense as that other's right reasonably appeared to the defendant." *Id.*

The trial court instructed the jury on the theory of perfect defense of another, but refused to instruct on imperfect defense of another. The defendant contends that the evidence also required an instruction on the theory that the defendant's imperfect defense of another reduced the killing to voluntary manslaughter. We disagree.

In order to establish either perfect or imperfect defense of another, the evidence must show that it appeared to the defendant and he believed it necessary to kill the deceased in order to save another from death or great bodily harm. *McKoy*, 332 N.C. at 644, 422 S.E.2d

at 716. It must also appear that the defendant's belief was reasonable in that the circumstances as they appeared to him at that time were sufficient to create such a belief in the mind of a person of ordinary firmness. *Id.* The relevant distinction between the two defenses is that imperfect defense of another arises when the first two elements are present but either the third or the fourth element is absent. *McAvoy*, 331 N.C. at 596, 417 S.E.2d at 497. The distinction is pertinent in the present case because the defendant contends that the jury could have found the absence of the fourth element, i.e., that he used excessive force.

The evidence adduced at trial tended to support two alternative versions of the events surrounding the killing of the victim Vergara. The first version was supported by the defendant's statement. It indicated that after the attack on the defendant's brother, the defendant went home and got his gun. Then, seeking revenge against his brother's attackers, he went to the apartment where he shot the victim. If there is no evidence from which a jury reasonably could find that the defendant in fact believed that it was necessary to kill to protect another from death or great bodily harm, the defendant is not entitled to have the jury instructed on either perfect or imperfect defense of another. *See State v. Bush*, 307 N.C. 152, 160, 297 S.E.2d 563, 569 (1982) (involving self-defense). This evidence did not support the requested instructions because it would only support a finding that the threat to the defendant's brother had passed and would not support a rational finding that the defendant in fact believed it necessary to kill the deceased to save his brother or that any such belief was reasonable at the time the defendant shot the victim.

The second version of the events surrounding the victim's death was supported by the testimony of the defendant's brother, William Perry. William testified that he was confronted by five or six Mexicans as he walked down Kerr Street. He said that several of the Mexicans threatened him with switchblade knives and another pointed a shotgun at his chest. William testified that during the confrontation, the defendant and Scottie Thompson appeared and began shooting at the victim and the other Mexicans in an effort to protect William. It was this second version of events, taken in the light most favorable to the defendant, which prompted the trial court to instruct the jury on the theory of perfect defense of another.

The defendant argues that this second version of events required that the trial court also give an instruction on imperfect defense of

another. He contends in this regard that the jury reasonably could have found that his use of deadly force was excessive under these facts, thereby negating perfect defense of another but allowing the jury to find that he acted in the imperfect defense of another. We conclude, under the evidence supporting this version of the events, that the defendant's contention is incorrect as a matter of law.

While one may use no more force in defense of another than the other could use in his own defense, one may use the same amount of force the other could have used on his own behalf. *State v. McLawhorn*, 270 N.C. 622, 629, 155 S.E.2d 198, 204 (1967). The defendant's brother would have been justified in using deadly force to repel the attack because, under this version of the events, his brother's life was threatened. As a matter of law, the use of deadly force under such circumstances would not be excessive. Therefore, this version of the evidence did not support an instruction on the imperfect defense of another, and the trial court did not err by denying the defendant's requested instruction.

**[5]** In another assignment of error, the defendant contends that the trial court erred by instructing the jury on acting in concert as a possible theory supporting a first-degree murder conviction in this case. He argues in support of this contention that the evidence did not show that he and Scottie Thompson shared a common plan or purpose to commit murder.

Under the theory of acting in concert, "one may be found guilty of committing the crime if he is at the scene with another with whom he shares a common plan to commit the crime, although the other person does all the acts necessary to effect the commission of the crime." *State v. Blankenship*, 337 N.C. 543, 557-58, 447 S.E.2d 727, 736 (1994). We conclude that there was sufficient evidence in the present case from which the jury could have inferred that the defendant and Scottie Thompson acted pursuant to a common purpose. First, the defendant's brother testified that when he was threatened, the defendant and Scottie Thompson appeared on the scene and began to shoot at his assailants in a concerted effort to protect him; either the defendant or Scottie Thompson fired the fatal bullets. Second, evidence that Thompson disposed of the defendant's weapon after the killing also tended to show that the defendant was acting in concert with Thompson. The defendant's contention that such evidence did not support an acting in concert instruction rests upon his argument that some evidence tended to show that he and Thompson did not act

to commit murder, but were in fact lawfully acting in defense of his brother. This is not determinative of the issue before us. Although evidence adduced at trial would support a jury finding that the defendant acted in perfect defense of another, it also would support a finding that the defendant and Thompson acted in concert to commit first-degree murder. As the evidence supported the acting in concert theory, the trial court properly gave an instruction on that theory.

[6] The defendant next contends that the trial court erred by denying his motion to dismiss the charge of first-degree murder due to insufficient evidence tending to show that the defendant premeditated, deliberated and formed the intent to kill. "In ruling on a motion to dismiss, the evidence must be considered in the light most favorable to the State, giving the State the benefit of every reasonable inference to be drawn from the evidence." *State v. Sweatt*, 333 N.C. 407, 414, 427 S.E.2d 112, 116 (1993) (citations omitted). As noted previously in this opinion, the evidence supported two alternative versions of the events on the night the victim was killed. However, the existence of contradictory evidence does not warrant a dismissal; the resolution of such contradictions is the province of the jury. *State v. Powell*, 299 N.C. 95, 99, 261 S.E.2d 114, 117 (1980). The trial court's function in considering motions to dismiss is to determine whether a reasonable inference of the defendant's guilt of the crime charged may be drawn from the evidence. *Id.* In the case *sub judice*, notwithstanding the conflicting evidence, a reasonable inference that the defendant acted with the intent to kill after premeditation and deliberation could be drawn from the defendant's statements to the police and Paulette Bolden. The defendant's statements to the effect that he shot the victim to retaliate for the victim's earlier threats to the defendant's brother were clearly sufficient evidence from which the jury reasonably could have inferred that the defendant intentionally killed the victim after premeditation and deliberation. Therefore, this assignment of error is without merit.

[7] In another assignment of error, the defendant contends that the trial court erred by failing to sustain two objections he made during the testimony of Benjamin Rodricuz. Rodricuz testified at trial through an interpreter. The first objection raised by the defendant concerned a line of questions by the prosecutor which sought to elicit from Rodricuz testimony concerning the location of a bullet mark on the porch of the apartment where the killing occurred and the direction from which the bullet had been fired. The defendant based this objection on the contention that the witness could not have had per-

sonal knowledge as to the direction from which the shots were fired, since he was inside the apartment when he heard those shots. The second objection concerned the same subject matter, but the objection was to a statement made by the interpreter, on his own initiative, after the witness indicated the location of the bullet mark on the porch post by pointing to a photograph. The defendant argues that when the trial court overruled the objection to the interpreter's statement, it impermissibly allowed the interpreter to testify as a witness even though he had not been sworn as a witness and he had no personal knowledge of the events surrounding the shooting.

Assuming *arguendo* that the trial court erred by overruling these objections, we conclude that the errors were harmless. Other testimony in this case was to the same effect as the inference which the witness and the interpreter drew—that the location of the bullet mark indicated that shots had been fired from the right side of the apartment. Furthermore, there was nothing particularly significant about the direction from which the shots were fired. Such evidence could be viewed as corroborating the evidence tending to support either of the two versions of the events on the night of the killing. Considering the redundant nature of this evidence and its insignificance, we are compelled to conclude that there was no reasonable possibility that a different result would have been reached had the alleged errors not been committed. Thus, no prejudicial error occurred. N.C.G.S. § 15A-1443(a) (1994). This assignment of error is overruled.

[8] In his final assignment of error, the defendant contends that the trial court erred by failing to suppress the statement he made to Officer Benton when the officer took him to the police station for questioning two days after the murder. He argues that the trial court erred by concluding that he knowingly and voluntarily waived his constitutional rights before making the statement and that it should have been excluded. In the instant case the trial court held a *voir dire* hearing to determine the admissibility of the defendant's statement. The trial court's findings of fact after such a hearing are conclusive and binding on this Court if they are supported by competent evidence. *State v. Simpson*, 314 N.C. 359, 368, 334 S.E.2d 53, 59 (1985) (citations omitted). This is true even though the evidence is conflicting. *Id.* We conclude that the evidence presented at the *voir dire* hearing supported the trial court's findings of fact and that none of the trial court's conclusions of law based on those findings were erroneous.

STATE v. PERRY

[338 N.C. 457 (1994)]

The evidence adduced in support of the trial court's findings showed that the defendant did not appear intoxicated or confused during the time when he was read his rights or when he was interviewed subsequently. Officer Benton testified that the defendant's eyes were clear, his speech was coherent, and that he did not raise his voice, get excited or appear to be nervous during the interview. The defendant indicated that he understood his rights and signed a written waiver of those rights as well as each page of the statement he gave to Officer Benton.

Two witnesses testified on the defendant's behalf during the *voir dire* hearing. Dr. Patricio Lara's initial testimony concerned the defendant's history of manic episodes. He also testified that the defendant was experiencing a manic episode when he first examined him approximately one week after the defendant's arrest. However, Dr. Lara could not give an opinion regarding whether the defendant understood his rights at the time he gave his inculpatory statement to Officer Benton. Nurse Flora Kimbrell testified that she saw the defendant several hours after he was arrested on 7 July 1992. She stated that the defendant was upset, tense and nervous at that time. Although she testified that in her opinion the defendant was delusional and could not have understood his rights, she also testified that he was able to understand the questions asked of him and that he responded in a reasonable manner to those questions.

Notwithstanding the evidence to the contrary, we conclude that there was substantial competent evidence to support the trial court's finding that the defendant understood his constitutional rights at the time he waived them. The facts found provide ample support for the trial court's conclusion that the defendant gave his statement voluntarily after a knowing and intelligent waiver of his rights. Therefore, we find no error in the trial court's denial of the defendant's motion to suppress his statement.

For the foregoing reasons, we conclude that the defendant received a fair trial free of prejudicial error.

No Error.