STATE OF NORTH CAROLINA
v.
TRAVIS DORAN RAMSEUR

No. COA12-62

Filed 2 April 2013

**1. Discovery—discovery violation—no prejudice**

The trial court did not err in a capital first-degree murder, attempted first-degree murder, assault with a deadly weapon with intent to kill inflicting serious injury, and conspiracy to commit first-degree murder case by concluding that the State's failure to disclose in discovery more than 1,800 pages of material to which defendant was entitled did not infringe upon defendant's constitutional rights. Defendant failed to show a reasonable probability that, but for the nondisclosure, he likely would have received a different verdict from the jury.

**2. Criminal Law—jury instructions—self-defense—defense of others—imperfect self-defense—insufficient evidence**

The trial court did not err in a capital first-degree murder, attempted first-degree murder, assault with a deadly weapon with intent to kill inflicting serious injury, and conspiracy to commit first-degree murder case by failing to instruct the jury on self-defense, defense of others, or voluntary manslaughter based upon imperfect self-defense or defense of others. There was insufficient evidence to support instructions on any of these theories.

Appeal by Defendant from judgments entered 10 September 2010 and amended order entered 8 October 2012 by Judge Richard D. Boner in Iredell County Superior Court. Heard in the Court of Appeals 6 June 2012.

*Attorney General Roy Cooper, by Assistant Attorney General Amy Kunstling Irene, for the State.*

*Glenn Gerding for Defendant.*

STEPHENS, Judge.

### Procedural History and Evidence

This appeal arises from a 2004 shooting that left two men dead and another seriously injured. Defendant Travis Doran Ramseur was tried in the superior court in Iredell County on two counts of capital first-degree murder and one count each of attempted first-degree murder, assault with a deadly weapon with intent to kill inflicting serious injury, and conspiracy to commit first-degree murder.

The evidence at trial tended to show the following: On 16 November 2004, four men from Statesville, Deleon "Scoot Rock" Dalton, Oderia Chipley, and two other men (collectively, "the Dalton group") visited a liquor house in Belmont. There the Dalton group encountered another group of men, Angelo Stockton, Timothy Cook, Charles Summers, and Desmond Thompson, (collectively, "the Stockton group") with whom they had a "beef." There was tension between the groups, and eventually, the Dalton group left the Belmont liquor house[1] for a local liquor house in Statesville known as "Mr. Wimp's." Later, the Stockton group also made its way to Mr. Wimp's. Stockton, Cook, and Summers all carried firearms concealed in the waistbands of their pants.

When the Stockton group entered Mr. Wimp's, Dalton told Chipley to call a friend named Al Bellamy and ask Bellamy to bring some guns to Mr. Wimp's. Chipley also called Defendant and told him "he might want to come over." As the men continued drinking, a dispute arose between members of the groups, which then turned into a physical fight between Dalton and Stockton. During the fight, Cook and Summers brandished their guns and warned everyone else not to get involved with their own weapons. Chipley and another man broke up the fight, and "Mr. Wimp" threw Stockton, Cook, and Summers out of the liquor house and locked the door. Cook warned those present they were going to "learn from their mistakes." Stockton, Cook, and Summers beat on the door and yelled for

---

1. *According to a media report citing law enforcement authorities, a liquor house is a location, often in a residential community, that illegally sells unregulated liquor and other forms of alcohol. See* Liquor Houses Havens for Crime, Police Say, http://www.wsoctv.com/news/news/liquor-houses-havens-for-crime-police-say/nGQQT/ (last visited Mar. 4, 2013).

Dalton to come outside. Chipley, who was still inside Mr. Wimp's, again spoke with Defendant about what was taking place at the liquor house.

Parish Reinhardt, a friend of Defendant's, testified that, on the night of the shootings, he, Defendant, and Bellamy had been dropped off near Mr. Wimp's. Defendant had a shotgun and a handgun with him, and Bellamy also had a firearm. Defendant, Bellamy, and Reinhardt positioned themselves across the street from Mr. Wimp's in a line of trees. Defendant, Bellamy, and Reinhardt saw Stockton, Cook, and Summers leaving the liquor house and yelling at the occupants. Stockton, Cook, and Summers eventually walked across the street toward where Defendant, Bellamy, and Reinhardt were hiding. When the three men reached the sidewalk, Defendant fired the first shot toward the three men; Bellamy and Reinhardt then began shooting at Stockton, Cook, and Summers. Stockton, Cook, and Summers returned fire causing Defendant and his accomplices to flee the area.

When law enforcement officers arrived at the scene, they found Stockton, Cook, and Summers had been wounded. When asked who had shot him, Stockton replied, "Scoot" and "Scoot Rock." Stockton died soon after making these statements. Cook also died from his wounds. Defendant did not present any evidence at trial.

The jury found Defendant guilty of all charges and recommended sentences of life imprisonment without the possibility of parole on the first-degree murder convictions. The trial court imposed two sentences of life imprisonment without parole for the murder convictions and an additional active sentence of 288 to 355 months for the remaining convictions, all to be served consecutively. Defendant gave notice of appeal in open court.

On 24 February 2012, while his appeal was pending in this Court, Defendant filed a motion for appropriate relief ("MAR") alleging serious discovery violations during his trial. By order entered 13 June 2012, this Court stayed the appeal and remanded the matter to the superior court in Iredell County for consideration of Defendant's MAR. On remand, the trial court held a hearing on 4 and 5 September 2012, and subsequently, on 27 September 2012, entered an order denying Defendant's MAR. On 8 October 2012, the court entered an amended order correcting minor typographic errors. The trial court concluded that the State *did* violate the requirements of N.C. Gen. Stat. § 15A-903 by failing to provide more than 1,800 pages of documents to Defendant, but also concluded that the State did not violate Defendant's constitutional rights and that Defendant was not entitled to a new trial or any other relief

because Defendant had failed to show a reasonable possibility that the outcome of his trial would have been different but for the nondisclosure. Following delivery of the transcript of the MAR hearing on 24 December 2012, Defendant filed his supplemental brief on 14 January 2013. The State filed its supplemental brief on 6 February 2013. We affirm the trial court's denial of Defendant's motion for appropriate relief and find no error in his trial.

## Defendant's MAR

[1] We first address Defendant's arguments that the trial court erred in failing to grant him a new trial where the State failed to disclose in discovery more than 1,800 pages of material to which Defendant was entitled. Specifically, Defendant argues the court erred in concluding that the State's discovery violations did not infringe upon Defendant's constitutional rights because Defendant failed to show a reasonable probability that, but for the nondisclosure, he likely would have received a different verdict from the jury. We are not persuaded by Defendant's argument.

> When considering rulings on motions for appropriate relief, we review the trial court's order to determine whether the findings of fact are supported by evidence, whether the findings of fact support the conclusions of law, and whether the conclusions of law support the order entered by the trial court.

*State v. Frogge*, 359 N.C. 228, 240, 607 S.E.2d 627, 634 (2005) (citation and quotation marks omitted). "When a trial court's findings on a motion for appropriate relief are reviewed, these findings are binding if they are supported by competent evidence and may be disturbed only upon a showing of manifest abuse of discretion." *State v. Lutz*, 177 N.C. App. 140, 142, 628 S.E.2d 34, 35 (2006) (citation and quotation marks omitted). In addition, the trial court's unchallenged findings of fact are binding on appeal. *State v. Jacobs*, 162 N.C. App. 251, 254, 590 S.E.2d 437, 440 (2004). "However, the trial court's conclusions are fully reviewable on appeal." *Lutz*, 177 N.C. App. at 142, 628 S.E.2d at 35 (citation and quotation marks omitted).

In criminal cases, our General Statutes require that

> [o]n a timely basis, law enforcement and investigatory agencies shall make available to the prosecutor's office a complete copy of the complete files related to the investigation of the crimes committed or the prosecution of the defendant for compliance with this section and any

disclosure under G.S. ['] 15A-902(a). Investigatory agencies that obtain information and materials listed in subdivision (1) of subsection (a) of this section shall ensure that such information and materials are fully disclosed to the prosecutor's office on a timely basis for disclosure to the defendant.

N.C. Gen. Stat. § 15A-903(c) (2011). In considering a defendant's right to relief from alleged non-constitutional errors such as statutory violations, our General Statutes further provide:

(a) A defendant is prejudiced by errors relating to rights arising other than under the Constitution of the United States when there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises. The burden of showing such prejudice under this subsection is upon the defendant. Prejudice also exists in any instance in which it is deemed to exist as a matter of law or error is deemed reversible per se.

N.C. Gen. Stat. § 15A-1443 (2011). For constitutional violations, in contrast, the same statute specifies a presumption of prejudice with the burden of proof on the State to demonstrate otherwise:

(b) A violation of the defendant's rights under the Constitution of the United States is prejudicial unless the appellate court finds that it was harmless beyond a reasonable doubt. The burden is upon the State to demonstrate, beyond a reasonable doubt, that the error was harmless.

*Id.* However, in the context of discovery violations, our Supreme Court has further observed:

The suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. However, . . . the United States Supreme Court rejected the idea that every nondisclosure automatically constitutes reversible error and held that prejudicial error must be determined by examining the materiality of the evidence. The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been

different. A reasonable probability is a probability suffi-
cient to undermine confidence in the outcome. We have
also held that when determining whether the suppression
of certain information was violative of a defendant's con-
stitutional rights, the focus should not be on the impact
of the undisclosed evidence on the defendant's ability to
prepare for trial, but rather should be on the effect of the
nondisclosure on the outcome of the trial. The defendant
has the burden of showing that the undisclosed evidence
was material and affected the outcome of the trial.

*State v. Tirado*, 358 N.C. 551, 589-90, 599 S.E.2d 515, 540-41 (2004) (cita-
tions and quotation marks omitted).[2] Accordingly, to obtain relief on
the basis of the State's discovery violations, whether they are properly
characterized as statutory, constitutional, or both, Defendant must dem-
onstrate prejudice: that there exists "a reasonable probability that, had
the evidence been disclosed to the defense, the result of the proceeding
would have been different." *Id.* at 589, 599 S.E.2d at 540 (citation and
quotation marks omitted).

Here, Defendant does not challenge any of the trial court's find-
ings of fact on the MAR, arguing only that the court erred in concluding
that he failed to establish prejudice. Accordingly, all of those findings
of fact are binding. *Jacobs*, 162 N.C. App. at 254, 590 S.E.2d at 440. On
appeal, Defendant asserts prejudice in the nondisclosure of three spe-
cific items: (1) evidence he contends pointed to Dalton as one of the
liquor house shooters, (2) a copy of a letter from informant Randall
Stovall and related notes taken by investigator David C. Ramsey of the
Iredell County Sheriff's Department during an interview with Stovall,
(3) information about a non-attribution agreement signed by Chipley,
and (4) information about acts of retribution by Cook's friends and fam-
ily agianst someone other than Defendant.

*I. Evidence about Dalton*

Defendant argues prejudice in the State's failure to disclose
Ramsey's handwritten notes about a statement by Willie Miller that
Dalton had asked Miller to "go get" a .40 caliber gun for him on the
night of the shooting. In unchallenged finding of fact 35, however, the

---

2. Tirado's trial and appeals up through the North Carolina Supreme Court review
cited here included his co-defendant, Eric Devon Queen. Following the decision of our
Supreme Court, Queen sought a writ of *certiorari* in the United States Supreme Court.
That petition was denied. *See Queen v. North Carolina*, 544 U.S. 909, 161 L. Ed. 2d 285
(2005). However, Tirado did not petition for such review.

trial court found that this information was also contained in a report about the interview with Miller which was timely provided to Defendant. Further, in unchallenged finding of fact 36, the court found that Ramsey had testified at the MAR hearing that Dalton himself had clarified to Ramsey that he asked Miller to bring him the gun after the shootings, but never received it because Dalton turned himself in to police as soon as he heard he was a suspect. As noted *supra,* unchallenged findings of fact are binding on appeal. *Id.* In light of these unchallenged findings of fact, we cannot conclude that Defendant has shown a reasonable probability that the outcome of his trial would have been altered if he had received Ramsey's notes before trial.

In a related argument, Defendant notes that the State failed to disclose a report of Ramsey's interview with Milton Gaines in which Gaines stated that Dalton referred to himself as "Guns." Defendant contends this information prejudiced him because it could have been used to establish Dalton's propensity to carry a gun. We are not persuaded. As the court noted in unchallenged finding of fact 39, Defendant did receive information in discovery that Dalton had been convicted of possession of a firearm by a felon and was on parole for that conviction at the time of the liquor house shootings. In light of this evidence about Dalton's propensity to carry guns, we cannot conclude that there is a reasonable probability that the outcome of his trial would have been different had Defendant known of Dalton's nickname.

## II.  Letter from Randall Stovall

The letter from Stovall stated, *inter alia,* "Plus I need you to let Ramsey know I've found him a [sic] eyewitness to the murder at [the liquor house] that I can get to talk." As noted by the State, Stovall's letter does not identify the eyewitness nor does it state that the eyewitness would provide information exculpatory to Defendant, to wit, by stating that Defendant was not one of the shooters. For this reason, we find the case relied on by Defendant inapposite. In *State v. Canady,* the trial court denied a defense motion to require the State to disclose "the name of an informant who implicated five other people as being involved in the murders and indicated where the murder weapon could be found[,]" as well as the name and address of another person who had made statements implicating someone other than the defendant in the crimes. 355 N.C. 242, 252, 559 S.E.2d 762, 767 (2002). Our Supreme Court found prejudice and awarded a new trial because the nondisclosure concerned "material, exculpatory information that someone other than [the] defendant committed the offenses." *Id.*

Here, in contrast, the withheld information was only about the existence of an alleged eyewitness. It is purely speculative to assume that if Defendant had known of Stovall's letter, he would have (1) convinced Stovall to disclose the name of the witness, (2) located the witness, (3) obtained exculpatory information from the witness, and (4) been able to introduce such exculpatory information at trial.

Further, we are mindful of our Supreme Court's direction that

> when determining whether the suppression of certain information was violative of a defendant's constitutional rights, *the focus should not be on the impact of the undisclosed evidence on the defendant's ability to prepare for trial,* but rather should be on the effect of the nondisclosure on the outcome of the trial.

*Tirado,* 358 N.C. at 589, 599 S.E.2d at 541 (citation and quotation marks omitted; emphasis added). Thus, the question is not whether the information in Stovall's letter would have provided a possibly valuable lead to Defendant in preparing for trial, but whether, in light of the evidence that *was* introduced at trial, information about a possible eyewitness would have led to a different verdict from the jury. We note that the evidence against Defendant at trial included, *inter alia,* extensive testimony from Reinhardt about Defendant's role in recruiting Reinhardt and Bellamy to arm themselves and then lie in wait outside the liquor house, in what was essentially an ambush of Stockton, Cook, and Summers. In light of the evidence against him, we cannot conclude that there is a reasonable probability the outcome of Defendant's trial would have been altered even if Defendant had known about Stovall's stated knowledge of an alleged eyewitness.

### III. Chipley's signed non-attribution agreement

Defendant asserts that Chipley was a "significant witness" in the case against him and that attacking Chipley's "credibility was critical." As Defendant acknowledges, he received a copy of an unsigned non-attribution agreement between Chipley and the State. Actually, Chipley had signed a non-attribution agreement covering statements made at the time of Chipley's interview with Ramsey. The State did not disclose the signed agreement or Ramsey's notes which indicate the agreement had been signed. Defendant now contends that the outcome of his trial would probably have been altered if he was aware that Chipley had actually signed the agreement. We are unconvinced.

The non-attribution agreement at issue states that Chipley was providing statements to law enforcement officers about the liquor house shootings "in conjunction with charging decisions and plea discussions" in the matter. The agreement further provides that any unsworn statements made by Chipley to law enforcement officers could only be used against him (1) for impeachment purposes should he testify in a criminal proceeding related to the liquor house shootings, (2) in a proceeding against Chipley for perjury or false statements, or (3) in connection with a criminal proceeding against Chipley for homicides or violent crimes other than the liquor house shootings, to the extent Chipley's statements pertained to any such crimes. Thus, the agreement covered only Chipley's interview with investigators and did not apply to his trial testimony.

At trial, on the morning Chipley was set to begin his testimony for the State, defense counsel asked the court for an opportunity to question Chipley out of the presence of the jury. During that *voir dire*, one of Defendant's attorneys asked Chipley, "I believe you were told, were you not, that — by Assistant District Attorney Jason Parker *that the non[-]attribution agreement that you had signed* did not cover any possible state charge of accessory before the fact of murder. Do you remember that?" (Emphasis added). This question makes clear that Defendant was aware of at least one non-attribution agreement with the State which Chipley *had signed.* We are unable to determine from the record on appeal whether the signed non-attribution agreement referred to by defense counsel on *voir dire* was the same agreement upon which Defendant bases this argument. In any event, once trial resumed, defense counsel cross-examined Chipley specifically about the consideration he received for his testimony against Defendant:

> Q. When you were prosecuted in federal court for this drug conspiracy case that you're currently serving time on, what was the original sentence that you were facing?
>
> A. 240 months.
>
> Q. 240 months. Which would be right at about 20 years; is that right?
>
> A. Yes.
>
> Q. And now you are actually serving half of that time; is that correct?
>
> A. Yes.

Q And you got that time cut from the federal govern-
ment for your agreement to testify against [Defendant],
didn't you?

A. There was a couple cases.

Q Is that a [sic], sir?

A. A couple cases.

Q. Yes, you agreed to testify against him in a couple
of cases?

A. Yes.

Q And so you received that benefit and your time was cut
in half. You come to us having received that gift from the
Federal Government; is that right?

A. Yes.

On appeal, Defendant does not explain what further impeachment of
Chipley he would have undertaken if Ramsey's notes or the signed agree-
ment had been disclosed to him before trial. In sum, (1) the jury was
made aware that Chipley was testifying as part of a deal which cut his
lengthy federal prison sentence in half, (2) defense counsel was aware
of at least one signed non-attribution agreement between Chipley and
the State, and (3) the State had turned over an unsigned version of a non-
attribution statement between Chipley and the State. In light of these
facts, we simply cannot conclude that Defendant has demonstrated the
required prejudice to obtain relief.

*IV. Notes about retribution by Cook's family toward Torrie Miller*

Defendant also argues prejudice in the nondisclosure of notes
about interviews regarding Torrie Miller. Miller was identified by at
least one witness as having shot Cook. In addition, undisclosed notes
from Ramsey regarding his interview with Stovall indicate that family
and friends of Stockton committed a drive-by shooting targeting Miller
in retribution for Stockton's death. However, Defendant concedes that
he received notes from the State that Stovall had told another witness
that he had heard that Stockton's family retaliated against Miller for the
shooting of Cook. In light of the evidence that Defendant did receive
about family and friends of a decedent who apparently blamed Miller
for the shooting and undertook a drive-by shooting in retribution, we
cannot hold that there is a reasonable probability that the State's non-
disclosure of notes regarding interviews about Torrie Miller altered the

outcome of Defendant's trial. Accordingly, we affirm the trial court's denial of Defendant's MAR.

### *Defendant's Direct Appeal*

[2] In his direct appeal, Defendant argues only a single issue: that the trial court erred in failing to instruct the jury on self-defense, defense of others, or voluntary manslaughter based upon imperfect self-defense or defense of others. We disagree.

We review a trial court's denial of a request for jury instructions *de novo. State v. Cruz*, 203 N.C. App. 230, 235, 691 S.E.2d 47, 50 (2010). However, where a defendant fails to request an instruction,

> we will review the record to determine if the instruction constituted plain error.

> Under a plain error analysis, defendant is entitled to a new trial only if the error was so fundamental that, absent the error, the jury probably would have reached a different result. Even when the plain error rule is applied, it is the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court.

*State v. Hardy*, 353 N.C. 122, 131-32, 540 S.E.2d 334, 342 (2000) (citations and quotation marks omitted), *cert. denied, sub. nom. Hardy v. North Carolina*, 534 U.S. 840, 151 L. Ed. 2d 56 (2001).

Here, at the charge conference, Defendant requested that the trial court submit voluntary manslaughter to the jury as to the two murder charges, contending that the evidence could support imperfect self-defense or imperfect defense of others. We review Defendant's arguments that the trial court erred in denying that request *de novo*. Defendant did not request an instruction on imperfect self-defense or imperfect defense of others as to the attempted murder or assault with a deadly weapon with intent to kill inflicting serious injury charges. Defendant also did not request an instruction on perfect self-defense or defense of others as to any of the charges against him. Accordingly, we review those arguments on appeal only for plain error.

> In North Carolina, a defendant is entitled to have the jury consider acquittal by reason of *perfect* self-defense when the evidence, viewed in the light most favorable to the defendant, tends to show that at the time of the killing it appeared to the defendant and []he believed it to

be necessary to kill the decedent to save h[im]self from imminent death or great bodily harm. That belief must be reasonable, however, in that the circumstances as they appeared to the defendant would create such a belief in the mind of a person of ordinary firmness. Further, the defendant must not have been the initial aggressor provoking the fatal confrontation. A killing in the proper exercise of the right of perfect self-defense is always completely justified in law and constitutes no legal wrong.

Our law also recognizes an *imperfect* right of self-defense in certain circumstances, including, for example, when the defendant is the initial aggressor, but without intent to kill or to seriously injure the decedent, and the decedent escalates the confrontation to a point where it reasonably appears to the defendant to be necessary to kill the decedent to save h[im]self from imminent death or great bodily harm. Although the culpability of a defendant who kills in the exercise of *imperfect* self-defense is reduced, such a defendant is *not justified* in the killing so as to be entitled to acquittal, but is guilty at least of voluntary manslaughter.

. . . . The trial court [i]s not required to instruct on *either* form of self-defense unless evidence was introduced tending to show that at the time of the killing the defendant reasonably believed h[im]self to be confronted by circumstances which necessitated [the] killing . . . to save h[im] self from *imminent* death or great bodily harm. . . .

. . . .

The killing of another human being is the most extreme recourse to our inherent right of self-preservation and can be justified in law only by the utmost real or apparent necessity brought about by the decedent. For that reason, our law of self-defense has required that a defendant claiming that a homicide was justified and, as a result, inherently lawful by reason of perfect self-defense must establish that []he reasonably believed at the time of the killing []he otherwise would have immediately suffered death or great bodily harm. Only if defendants are required to show that they killed due to a reasonable belief that death or great bodily harm was imminent can the justification for homicide remain clearly and firmly rooted

in necessity. The imminence requirement ensures that deadly force will be used only where it is necessary as a last resort in the exercise of the inherent right of self-preservation. It also ensures that before a homicide is justified and, as a result, not a legal wrong, it will be reliably determined that the defendant reasonably believed that absent the use of deadly force, not only would an unlawful attack have occurred, but also that the attack would have caused death or great bodily harm. The law does not sanction the use of deadly force to repel simple assaults.

The term "imminent," as used to describe such perceived threats of death or great bodily harm as will justify a homicide by reason of perfect self-defense, has been defined as immediate danger, such as must be instantly met, such as cannot be guarded against by calling for the assistance of others or the protection of the law. Our cases have sometimes used the phrase "about to suffer" interchangeably with "imminent" to describe the immediacy of threat that is required to justify killing in self-defense.

*State v. Norman*, 324 N.C. 253, 259-61, 378 S.E.2d 8, 12-13 (1989) (citations and some quotation marks omitted) (emphasis in original).

The elements of perfect defense of another are essentially the same as those for perfect self-defense. In general one may kill in defense of another if one believes it to be necessary to prevent death or great bodily harm to the other and has a reasonable ground for such belief, the reasonableness of this belief or apprehension to be judged by the jury in light of the facts and circumstances as they appeared to the defender at the time of the killing. The right to kill in defense of another cannot exceed such other's right to kill in his own defense as that other's right reasonably appeared to the defendant.

*State v. Perry*, 338 N.C. 457, 466, 450 S.E.2d 471, 476 (1994) (citations and quotation marks omitted). Likewise, imperfect defense of others can reduce a defendant's culpability where the defendant used excessive force or was the initial aggressor. *Id.* at 466-67, 450 S.E.2d at 476-77 (citations omitted).

Here, Defendant contends that, in the light most favorable to him, the evidence tended to show that he was acting in self-defense or in

defense of the Dalton group and others inside Mr. Wimp's when he fired on Stockton, Cook, and Summers. We are not persuaded. Our review of the evidence reveals nothing that would support a reasonable belief by Defendant that he or the people inside Mr. Wimp's were in *imminent* danger of death or great bodily harm unless Defendant fired on Stockton, Cook, and Summers. There was evidence before the jury that those inside Mr. Wimp's were afraid and that Stockton, Cook, and Summers had been yelling threats and banging on the door of the liquor house, but nothing suggested Stockton, Cook, and Summers were about to gain access to Mr. Wimp's again. Further, at the time Defendant started shooting, Stockton, Cook, and Summers had stepped away from the liquor house and were on the sidewalk. As for Defendant's claim of self-defense, there was no evidence that Stockton, Cook, or Summers were even aware of Defendant's presence on the scene, much less evidence that Defendant's life was in imminent danger when he fired the first shot.

> The trial court [i]s not required to instruct on *either* form of self-defense unless evidence was introduced tending to show that at the time of the killing the defendant reasonably believed h[im]self to be confronted by circumstances which necessitated [the] killing . . . to save h[im]self from *imminent* death or great bodily harm.

*Norman*, 324 N.C. at 260, 378 S.E.2d at 12 (citation omitted). Defendant was not entitled to a jury instruction on perfect or imperfect self-defense or perfect or imperfect defense of others. Accordingly, we find no error in Defendant's trial.

AFFIRMED IN PART; NO ERROR IN PART.

Judges BRYANT and McCULLOUGH concur.